FRANK E. FOLTS ET AL., APPELLEES, V. GLOBE LIFE INSURANCE COMPANY ET AL., APPELLANTS.

FILED JANUARY 4, 1929. No. 26604.

*Brogan, Ellick & Raymond, Gaines, McGilton, Van Orsdel & Gaines* and *Hainer, Flansburg & Lee*, for appellants.

*A. M. Morrissey, M. L. Donovan, C. J. Campbell, G. E. Hager, Don W. Stewart, John P. Breen, William B. Price* and *W. H. Hatteroth, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ.

HOWELL, J.

This is an appeal by Globe Life Insurance Company, Sovereign Camp Woodmen of the World, W. A. Fraser, John T. Yates, T. E. Patterson, and J. E. FitzGerald, from a decree of the district court for Lancaster county, requiring all appellants, except Sovereign Camp Woodmen of the World, to return to Sovereign Camp Woodmen of the World certain bonds and moneys aggregating $2,000,000, paid to the Globe Life Insurance Company by Sovereign Camp Woodmen of the World and individual appellants in subscribing for practically the total capital stock of Globe Life Insurance Company, which appellees, Frank E. Folts, Charles Bowen, and William B. Price, as plaintiffs, and Alex F. Hummel, as intervener, claim to have been illegal

and fraudulent, and enjoining each and all of the appellants from using the good will, property or organization of Sovereign Camp Woodmen of the World in the business of Globe Life Insurance Company.

Appellees will be referred to as plaintiffs, Globe Life Insurance Company as Insurance Company, and Sovereign Camp Woodmen of the World as W. O. W.

The petition and the petition of intervention are quite lengthy and, in a general way, seek the same relief.

Plaintiffs sue, as members of W. O. W., for themselves and all others similarly situated, and aver: W. O. W. is a Nebraska fraternal benefit corporation, organized for the sole benefit of its members, and not for profit, with a membership of about 450,000, carrying insurance of about $750,-000,000; plaintiffs are members, in good standing; the individual defendants, with others, compose the Sovereign Executive Council of W. O. W., also are members of the Sovereign Camp, and, in violation of the articles of incorporation and the statutes of Nebraska governing fraternals, conspired to organize the Insurance Company with funds of W. O. W., and to divert its business to the Insurance Company; on June 16, 1927, certain officers of the Executive Council caused the Sovereign Camp to adopt a resolution directing the Executive Council to organize a legal reserve life insurance company, with capital and surplus of $2,000,000, to be paid from funds of W. O. W.; the defendant officers did organize and incorporate the Insurance Company on October 31, 1927, under the laws of Delaware, its capital stock and surplus to be paid before commencing business; its nature, objects and purposes were to issue contracts of annuity, endowment, disability, accident, health, and other forms of life insurance, and to reinsure and coinsure contracts issued by other corporations; defendants Fraser, Yates, Patterson and others were elected president of the board, vice-president and secretary, respectively, of the Insurance Company, and, on November 1, 1927, caused certificates of stock of Insurance Company

to be issued to themselves, others and W. O. W., representing $2,000,000 in face and surplus value, $1,997,200 being issued to Fraser and Yates as trustees of W. O. W., and caused bonds and cash of the total value of $2,000,000 to be turned over to the Insurance Company, including $100,-000 in bonds deposited on December 16, 1927, with the department of trade and commerce of Nebraska; November 14, 1927, said officers procured certificates in Delaware and Nebraska, authorizing the Insurance Company to do business in both states; under its articles of incorporation and laws of Nebraska, W. O. W. had no authority to do such things; the organization and purchase of the stock of the Insurance Company were illegal and void; organizers and deputies are being trained to sell insurance for the Insurance Company and to solicit members of W. O. W. to purchase such insurance; circulars, pamphlets, letters and other advertising are being circulated among the members of W. O. W., commending the Insurance Company for its line of insurance; the officers of W. O. W. are devoting their time and funds of W. O. W., and its good will, to acquire business for the Insurance Company, greatly injuring W. O. W.

The prayer is that the bonds and money, turned over to the Insurance Company, be returned to W. O. W; the officers named be removed and an election of new officers ordered; a permanent injunction be issued to prevent defendants from interfering with the business of W. O. W.; the Insurance Company be ordered to pay W. O. W. for losses and damages, and for general equitable relief.

The petition of intervention contains similar allegations, in addition to others, among which, that the individual defendants were officers of both the Insurance Company and W. O. W.

Defendant Bliss, secretary of trade and commerce, filed no answer or other pleading, except a general demurrer, which was overruled.

W. O. W. answered, in substance: Admitted practically

all of the allegations of the petition except illegality and fraud; alleged that it was a self-governing body, with a lodge system, organized under the laws of Nebraska, in the name of Sovereign Camp of W. O. W., made up of elective officers and delegates; under its constitution and laws, it is authorized to conduct the business affairs of W. O. W., and it had provided for investments of accumulated funds as authorized from time to time; Sovereign Camp authorized the use of $1,997,200 of surplus funds of W. O. W. to subscribe for stock in the Insurance Company; it had ample funds for all purposes and a large surplus, exclusive of the mortuary funds, justifying such investment; it became apparent to the officers of W. O. W., and to the members of Sovereign Camp, it would be to the best interests of W. O. W. to offer to its members forms of life insurance *which it was not permitted to write under the laws* (italics ours), which fact was called to the attention of the Sovereign Camp in 1925, when the Sovereign Commander (Mr. Fraser) was requested to submit plans for writing such insurance, which he, accordingly, did at the Sovereign Camp meeting in June, 1927; the report was submitted to a committee which reported by resolution, directing the Executive Council to organize a corporation, invest surplus funds in its stock, and sell the same to its members; the members of the Sovereign Camp and officers of W. O. W. were wholly actuated by a desire to serve the best interests of W. O. W. and its members, and to strengthen W. O. W.; pursuant to the resolution, the Insurance Company was formed; about December 10, 1927, full information concerning the stock was mailed to every member, advising them that they might buy as much thereof as they desired; the plaintiffs are without equity, having no interest in the association; suit was not brought in good faith, and, even if plaintiffs had any legal right to have the funds of W. O. W. apportioned among the members, each would receive less than $5; immediately after adoption of the resolution, it was fully explained to plaintiffs and all members as

to the plans, by notice through the mails, and such action was known to and discussed by the members long before suit was brought; in reliance upon the resolution, said stock was purchased and paid for by W. O. W., and Insurance Company entered upon the business of life insurance; when this suit was commenced December, 1927, the stock had been resold by W. O. W. to members and a large amount of life insurance had been issued to, and premiums paid thereon by, policyholders, in reliance upon the action of June, 1927, and acquiescence by all members; to grant the prayer of the plaintiffs, compelling restoration of the funds of W. O. W., great and irreparable loss and damage would be caused to W. O. W. as the principal stockholder, to the Insurance Company, and to its policyholders, without corresponding benefits to any one; neither the plaintiffs nor any member complained of, or protested, the action taken; by reason of all of which the plaintiffs are estopped, and, because of their acquiescence, laches has been such as to deny equitable relief.

Further answering: Plaintiffs have no capacity to sue, for that, as section 57 of the constitution and laws provides for automatic forfeiture of membership if a member should sue W. O. W. or its officers before submitting his grievances to their consideration, and by final appeal to the Sovereign Camp, they had lost their membership by bringing this suit, since the Executive Council had a session of the Sovereign Camp scheduled for February, 1928. (We now observe that no appeal to any power short of the Sovereign Camp would have availed, and for plaintiffs to have delayed all action until the Sovereign Camp meeting scheduled for February, 1928, would have greatly reinforced the plea of laches. Moreover, there could be no appeal from actions of the Sovereign Camp. It is certain, a request addressed to it to retreat would have been ignored, neglected or instantly denied. The law does not require the doing of idle things).

The Insurance Company filed a similar answer, plead-

ing affirmatively: Its incorporation under the laws of Delaware, to engage in life insurance business; it caused a large amount of insurance to be written for which it collected premiums; adopted all of the allegations of the answer of W. O. W., and plead estoppel.

Answers were filed for Fraser, Yates, FitzGerald, and Patterson, and Fraser and Yates as trustees, adopting the answer of W. O. W.

Replies were filed by plaintiffs to each answer.

Answers were filed to the petition of intervention, adopting, in the main, the several answers to plaintiffs' petition, to which suitable replies were filed.

It being quite impossible to go into details, we deem it sufficient to state the situation generally.

W. O. W. was organized in 1890 under the laws of Nebraska, as a nonprofit fraternal benefit association, continuously thereafter doing business as such. The articles of incorporation and laws of the association and the laws of Nebraska existing in 1927, when officers of W. O. W. organized the Insurance Company, will be referred to, pausing to observe that, under the laws of Nebraska existing until 1887, fraternal benevolent societies, issuing certificates of insurance, were subject to the general corporation and insurance statutes in force, and, by act of the legislature (Laws 1887, ch. 18) they were exempted therefrom. Section 7902, Comp. St. 1922, as amended by chapter 120, Laws 1925, provided: "A fraternal beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each such beneficiary association shall have a lodge system, with ritualistic forms of work, and a representative form of government."

The consitution and laws of W. O. W., in effect September 1, 1927, provided, among other things: Section 1. "This corporation shall be known as the 'Sovereign Camp

of the Woodmen of the World,' * * * and its supreme legislative body shall be known as the Sovereign Camp."

In section 2, W. O. W. is given original and appellate jurisdiction as to general welfare; power to determine charges against members and appeals from Camps, Head Camps and the Sovereign Executive Council; to enact laws; levy and collect assessments, premiums and dues "necessary to pay all beneficiary claims and expenses of management, and shall have generally such powers and may perform such duties as it may deem wise for the welfare of the association."

Section 3. "The objects of this association shall be to combine white persons of sound bodily health, * * * into a secret, fraternal beneficiary and benevolent association; provide funds for their relief; comfort the sick and cheer the unfortunate by attentive ministrations in times of sorrow and distress; promote fraternal love and unity; create funds," etc.

Section 25 provides, among other things, that the Sovereign Camp shall have *de novo* jurisdiction over offenses committed by members for "instituting suits or legal proceedings against the Sovereign Camp or any of its officers without first submitting grievances or complaints to the Sovereign Executive Council for adjudication," and that appeals are taken from camp trials to the Sovereign Commander, thence to the Sovereign Executive Council, thence to the Sovereign Camp; all other appeals to be from the Sovereign Commander to the Discipline Committee, thence to the Executive Council, thence to the Sovereign Camp.

Section 57 provides, among other things: "If a member, for any cause whatever, shall at any time or for any purpose institute a suit or suits for any cause or complaint against the association or any of its officers, *because of any action or contemplated action of such officer* (italics ours) or on account of the action of any of its committees, without first submitting his grievances to and exhausting his remedies before the proper tribunals of this association,

his beneficiary certificate shall at once become void and of no effect, and all payments theretofore made thereon shall be retained by the association as liquidated damages," etc.

Section 89 provides, among other things, that a member, who is found guilty of violating association laws, may be expelled from fraternal relations and benefits for a time or for life, but, where the member is expelled from fraternal benefits and relationships, "he may retain his insurance protection by paying the assessments on his certificate," if so determined by the person, committee or body before whom he is tried.

Section 95 provides: "As often as practicable, when funds have accumulated not immediately needed to pay the obligations of the association," they shall be invested in bonds of the United States, state, or subdivision of a state, in federal farm loan bonds, or notes secured by first lien real estate mortgages, "and may make such other investments as may be at any time authorized by the Sovereign Camp," which investments (section 93) "may be used for the payment of benefits and monument obligations when the beneficiary fund on hand, together with one beneficiary instalment of assessment per month on all of the members of this association, is not sufficient to pay the approved beneficiary and monument obligations," and "if the uninvested fund on hand, together with said one instalment of assessment and beneficiary funds on hand, are not sufficient to pay such approved beneficiary and monument obligations, then the Sovereign Commander and Sovereign Clerk shall convert so much of the invested fund into money as may be sufficient to meet the excess of losses over that which the said one instalment of assessment, together with the beneficiary fund and uninvested funds on hand, will pay, which shall be transferred to and placed in the beneficiary fund and disbursed for the payment of such approved claims and obligations as aforesaid."

The Sovereign Executive Council was ostensibly author-

ized and directed, by resolution passed June 16, 1927, to do the following: "To organize a legal reserve life insurance company with an authorized capital stock of not less than $1,000,000, and cause to be issued so much of said capital stock from time to time as may in their judgment be necessary; * * * said capital stock shall be sold at 2 to 1, that is to say, each $1.00 of capital stock shall be sold for $2.00 to cover the capital and surplus, and the amount issued and delivered to this association shall be paid for at said rate, and shall be held by said association as its other investments are held, except that it may sell all or any portion of such capital stock to the members of this association in such amounts as the members may desire to purchase;" the board of directors of the corporation to be organized "shall at no time exceed twenty-one members, and that at all times fourteen of said members shall be the Sovereign officers of this association;" the corporation "shall be incorporated in such state and with such name and for such amount of paid-up capital stock as the Executive Council of this association shall determine," and such officers are "directed to draw upon the funds of this association for such sum as may be necessary to pay for the capital stock of such life insurance company issued to this association, and to make payment to said life insurance company of the amount of the capital stock so purchased by this association upon the delivery to said association of said capital stock."

About two years before June, 1927, the Sovereign Commander began to formulate in his mind some plan to circumvent the recognized limitations of a fraternal benefit association to write old line insurance. In 1925, the legislature (Laws 1925, ch. 122) authorized fraternal beneficiary associations to consolidate or make reinsurance contracts with other associations or organizations or life insurance companies authorized to do business in Nebraska, requiring a certain procedure. In 1927, the legislature (Laws, 1927, ch. 135) authorized corporations and associations,

having a representative form of government without capital stock, doing business without profit for the sole benefit of their members and beneficiaries, to change their form of government and the character of insurance they should write, and become legal reserve life insurance companies.

W. O. W. did not seek to take advantage of either act, but sought to go around both by organizing the Insurance Company. Prior to the Sovereign Camp meeting at Los Angeles in June, 1927, the Sovereign Commander worked out a plan which he then submitted to the Sovereign Camp. A committee was appointed to investigate and report on that plan. It reported in the form of the resolution above referred to.

During the discussion of the resolution, Sovereign Commander Fraser being in the chair, some members insisted that Woodmen of the World should retain 51 per cent. of the stock to be sold to W. O. W. In an extended colloquy between the Sovereign Commander and two delegates, the Sovereign Commander adroitly maintained his position against any change. In one statement, he said: "It is so safeguarded that this Sovereign Camp at all times controls the new company on a ratio of two to one. So I think it is safeguarded at least 200 per cent. because it is a two to one proposition in favor of the Sovereign Camp."

An amendment to the committee's resolution was offered, to the effect that the Sovereign Camp "shall retain at least 51 per cent. of the capital stock of this new corporation." The Sovereign Commander stated, "If I were not in the chair, I would make an amendment that they own 100 per cent." A point of order was made against the amendment and sustained by the Sovereign Commander. The delegate stated: "I change my amendment, then, that it sell no more than 49 per cent. of the stock of this corporation." Sovereign Commander: "Who is it going to sell it to?" Delegate: "The present members of the Woodmen of the World." Sovereign Commander: "Sup-

posing we cannot supply the demand?" Delegate: "Don't sell but 49 per cent. and prorate it out." Sovereign Commander: "I am sorry you have not had confidence in the Sovereign officers." Sovereign Commander: "Let me tell you that in the time that I have run the affairs of this organization I have brought it up from an insolvent wreck until it is the richest in the world. There has never been a dollar lost in this society, and never will be, in my judgment, no matter who is presiding over it, because I believe the great membership of this organization are able and keen enough to select men who are both honest and capable."

The resolution was adopted and the executive officers at once proceeded actively to bring about the organization of the Insurance Company.

The only information or notice which the members at large of the W. O. W. had or could have had of this proceeding, so far as the record shows, was the publication of the proceedings of the Sovereign Camp in "Sovereign Visitor," a paper published and mailed monthly to members. The only purported account of the proceedings, given in the "Sovereign Visitor," aside from an article republished from the "Los Angeles News," relating to the matter in question, is as follows: "Monday, June 13. Sovereign Commander Fraser outlined a program for this special meeting, appointed certain committees, taking a recess until" the next day. "June 16. The committee on Sovereign Commander Fraser's report submitted its report, which was discussed pro and con, taking the entire morning. The committee offered resolution commending very favorably the entire report. Sovereign Lecturer, A. G. Matthews, spoke at great length on the Sovereign Commander's report. The entire executive board of Sovereign officers was reelected for four years—till 1931. Sovereign Commander Fraser thanked the delegates for the esteem and confidence bestowed on the officers, hoping that the present progress and prosperity would keep on and on for all time."

The "Los Angeles News" article was preceded by misleading headlines in large type, in these words: "SOVEREIGN CAMP TAKES ACTION TO WRITE ANY KIND OF INSURANCE POLICY." That article appeared in the "Sovereign Visitor" on a page other than that upon which the purported proceedings of the Camp were given. That publication was at least ambiguous, if not also deceptive. Its purport was that the plan of the Commander "for a commercial insurance company with capital and surplus of $2,000,000 for members and under the joint control of the Pacific Woodmen Life Association and W. O. W., was adopted. The stock is to be purchased by the association and resold to its members on demand. The name of the company will be announced later. Directors, of the Pacific-Woodmen Life Insurance Association and W. O. W. * * * directors will administer the affairs of the new combination."

The articles of incorporation of the Insurance Company were filed in Delaware October 31, 1927, and, so far as advised, this was not known to W. O. W. members except those who were actively engaged in its organization and perhaps a few of their personal friends and supporters. They were filed in Nebraska November 14, 1927. There is nothing to show that the plaintiffs, or W. O. W. members generally, knew that. The only evidence having probative force that the plaintiffs, or any others of the members at large except as above stated, had knowledge of the organization of the Insurance Company, what its articles of incorporation were, and what the organizing officers had done, was imparted by letter sent out by the Sovereign Commander on December 10, 1927, in which the members were given the privilege of buying stock in the Insurance Company until January 1, 1928.

We do not take into consideration the testimony relating to the lease and sale of the W. O. W. Building in Omaha.

Up to the trial of this case in the district court, the W. O. W. sold, of the capital stock it received in the Insur-

ance Company, $430,000 worth, $110,000 being to three persons named, and $320,000 worth to small purchases by members, leaving still on hand $1,570,000 worth. All purchasers of stock were members of W. O. W., some of whom were made members for that purpose.

Up until December 23, 1927, the Insurance Company wrote insurance amounting to $1,400,000, which increased to $3,200,000 by April 14, 1928. Premiums collected to January 1, 1928, were $10,677.20, and, from January 4, 1928, to April 18, 1928, $20,672.31, or a total of $31,349.51. How much of these premiums were collected up to December 23, 1927, is not disclosed.

Appellants' counsel offers this statement: "There was still plenty of time for the officers of the association to consider what safeguards were necessary, and it was entirely in their power to discuss and adopt safeguards to prevent the control of the Life Insurance Company from passing out of the hands of the Woodmen, either as an association, or of its members." This is a pregnant statement. It was likewise in their power to do otherwise. It, in effect, admits that no such safeguards existed up to then. The time to have considered "what safeguards were necessary" was before the $2,000,000 left the treasury of W. O. W. We do not understand why there was so much aversion, at the Sovereign Camp meeting in June, to a provision in the articles of incorporation of the Insurance Company to retain 51 per cent. of the stock. In the words of Ben Johnson, "The dignity of truth is lost with much protesting."

It is contended by appellants that, as the only "restrictions in our law upon the activities of these societies, except as may apply to the citizens generally," are statutory, the burden is "upon plaintiffs to point out what section * * * was violated." We do not accept this as a correct statement. The act of the legislature, exempting fraternals from general insurance laws, gave them no additional powers. The effect was to deprive them of business powers incident to corporations generally and to with-

hold all except indwelling, declared powers. *Scott v. Bankers Union*, 73 Kan. 575. Every act of the legislature, in and subsequent to 1887, clearly indicate that such societies could transact business "for the sole (mutual) benefit of its members and their beneficiaries, and not for profit," which is significant and all-controlling. General business exploits and activities of such associations are manifestly excluded. No one could seriously contend that W. O. W. possessed authority to go into a foreign jurisdiction, organize a foreign corporation, controlled by foreign laws, and then escort such corporation into Nebraska solely for the purpose of having it do what W. O. W. could not, and did not, believe it had a right to do directly. The claimed purpose of organizing the Insurance Company as a subsidiary helpmeet of W. O. W. is devoid of candor and rectitude, in face of the record made by the officers themselves, who left it easily within their transient and ephemeral power to sell every share of stock subscribed for by W. O. W., whereby everything claimed as a justification of their acts could be lost. There is no tie between W. O. W. and the Insurance Company which can be preserved by law. It does not even limit potentialities to present officers. They extend to future officers who have not been so boundlessly trusted.

It is said: "The new company (is) to act as a subsidiary to the Woodmen of the World, and to cooperate with it in the insurance field." "Subsidiary" means an "inferior portion or capacity." Just how the Delaware corporation can be said to be inferior to W. O. W., with a majority of its board of directors made up of officers of W. O. W., which board of directors may delegate to two or more persons its power, is not plain. By what reasoning can it be determined, in advance, which corporation may, and how soon, end in an inferior position? The whole movement so far has been toward benefiting the Delaware corporation to the full measure of its entire capital stock at the expense of W. O. W., and reveals something new as a stock-selling scheme.

There is no doubt that W. O. W. would over-leap its powers if it undertook a legal reserve life insurance business under its present articles, constitution and laws. The resolution of the committee, endorsing the plans of the Sovereign Commander, disclosed that he was urging the organization of a company whose capital stock "shall be subscribed by this association," all of which "shall be sold to the members of this association, except such few shares as are necessary to be held by the persons acting as incorporators of said company." The corporation, which was organized by the officers of W. O. W., not only failed to make any reference to that, but the Insurance Company board of directors was authorized to make and alter its own by-laws, or by resolution, so that "two or more of their number to (would) constitute an executive committee" which shall have "and exercise any or all of the powers of the board of directors in the management of the business and affairs of this corporation."

There were other provisions in these articles authorizing the board of directors (executive committee) to refuse stockholders access to its corporate books and records, denying them such right except it be conferred by law or by resolution of the board of directors or stockholders.

That part of the resolution of the Sovereign Camp which required 14 of its officers to be always on the board of directors of the Insurance Company has not been carried out. There are no safeguards in favor of the W. O. W. to protect its property, funds and interest. The Insurance Company is wholly independent of W. O. W. as a legal entity. The net results of the transaction so far is the throwing of $2,000,000 of property and assets of the W. O. W. into the lap of the Insurance Company. It is true that, as conditions stood at the time of the trial of this case, it was in the power of the officers of W. O. W. to refrain from selling a majority of the Insurance Company's stock. It is true, Mr. Fraser testified he had no intention of selling more than 49 per cent. Such skeleton

is a trifling prop. Many doors are left open through which the Insurance Company can pass to gain complete control of its organization, to the exclusion of W. O. W., regardless of the resolution of June, 1927, one of which is a provision in its certificates of stock: "No stockholder may sell or transfer his stock or this certificate until said stock has been offered to the company for sale at the market price, and, if there is no market price, then at book value. If the company does not find a purchaser for said stock within 15 days, the holder may sell and legally transfer the same." What power does W. O. W. have over its members to compel them to hold stock in any corporation?

With an energetic campaign, the Insurance Company could acquire a majority of its stock in its own hands, or in the hands of friends or dummies, and elect its board of directors without naming one member or one officer of W. O. W.

Later in this opinion, in discussing the question of investment, attention will be called to the fact that, under the articles of incorporation of the Insurance Company, there was almost no limit to the kinds of business which it was authorized to transact, and that W. O. W. did not possess authority to engage in any one mentioned except to invest in some of the securities enumerated.

Until the passing of the June resolution, we find no instance where the W. O. W. assumed or claimed power to organize independent corporations, or to conduct an old line business for profit, having no thought of benevolence or brotherly love. The resolution itself was in violation of the articles of incorporation, constitution and laws of the order, which the laws of Nebraska required to be filed with the state. In no sense was it an amendment to its articles. Were it such, it would be void. Had the constitution and laws provided for conducting a business for profit, it would have been void, as opposed to its articles of incorporation and the statutes of Nebraska, if not section 1, art. XII of the Constitution of the state. The resolution itself, being a nullity, affords no protection to any one.

Fraternal insurance orders seem to have been favored because of their benevolent, rather than commercial, pretensions, and they should be confined to their chosen field or remove the shield by changing their form of government, as provided by law they may do.

Counsel gave three illustrations of the use of its surplus funds, to wit, constructing and endowing a tuberculosis hospital, maintaining a uniform rank where members are drilled in encampments, and its Omaha radio station. They might be justified as aiding the health of, and wholesome entertainment for, its members, and legitimate advertising. We see no connection between the W. O. W. and the Insurance Company to justify a claim that the Insurance Company is an incident to conducting fraternal insurance.

Counsel very aptly state that the legislature was familiar with the situation. We doubt if history records an instance where a fraternal, incorporated or otherwise, ever attempted to do what is attempted here, without some statutory authority. Mr. Bradshaw, chief counsel for W. O. W., testified he never heard of such. Up to this time, no fraternal has so attempted to abuse its conceded and quite well-understood privileges as to call for legislation. Existing laws will control that until the legislature otherwise provides. To follow out the extraordinary claims, made for W. O. W., to their ultimate conclusion, it could create a corporation to buy and operate almost every business in Nebraska, under the pretext of hiring clerks who would give it business, by joining the order with the privilege of purchasing stock in its corporation.

The officers of W. O. W. and the Sovereign Camp knew they could not write old line insurance and, because of that, set up a circumbendibus to outwit the law. W. O. W. possessed power to assess and draw money from its members for two general purposes only—to pay benefits and necessary operating expenses.

We reach the conclusion that the resolution passed by Sovereign Camp in June, 1927, at Los Angeles, was void

and contrary to the laws of the state of Nebraska, its own articles of incorporation, constitution and laws, and public policy. It could not confer authority upon any of its officers to organize an old line insurance company. We are pressed to this conclusion from the nature of the business W. O. W. was incorporated to perform; limitations implied by law upon fraternal benefit associations; interpretations by the associations themselves and hundreds of thousands of their members; and the public policy of the state, manifested by the administration of insurance corporations, and further indicated by the two acts of the legislature in 1925 and 1927, affording to such associations an opportunity to write other classes of insurance, upon conditions prescribed.

This brings us to the question of W. O. W.'s power to invest. It has been discussed with force that the provision in section 95 (a), Constitution and Laws of W. O. W., saying officers "may make such other investments as may be at any time authorized by the Sovereign Camp," justifies the organization, and subscription to stock, of insurance companies as an investment.

Aside from the fact that the law does not so regard it, it is hardly compatible with the spirit of the resolution which suggests that the officers of W. O. W. shall sell all of the stock to its members, except such few shares as are necessary to go to the incorporators. The purpose of organizing W. O. W. was not to seek investments to be sold to its members on demand, but to benefit them in the spirit of fraternalism and brotherly love, by giving them insurance within the reach of men and women desiring to protect their beneficiaries, such as its articles of incorporation, constitution and laws permit. Even though it be said that stocks of a going corporation may be the subject of investment, the following authorities justify the conclusion that subscriptions for stock, in the organization of a new corporation, cannot be regarded as an investment. *Anglo-American Land Mortgage & Agency Co. v. Lombard*, 132 Fed. 721; *DeLaVergne Refrigerating Ma-*

*chine Co. v. German Savings Institution,* 175 U. S. 40; 2 Fletcher, Ency. of Corporations, 2071, sec. 1119; *Robotham v. Prudential Ins. Co.,* 64 N. J. Eq. 673, 53 Atl. 842; *McAlester Mfg. Co. v. Florence Cotton & Iron Co.,* 128 Ala. 240, 30 So. 632; 14-A C. J. sec. 2129; *Franklin Co. v. Lewiston Institution for Savings,* 68 Me. 43; 1 Thompson, Corporations (2d ed.) 792, sec. 652; *Commercial Fire Ins. Co. v. Board of Revenue,* 99 Ala. 1; *Nebraska Shirt Co. v. Horton,* 3 Neb. (Unof.) 888.

If W. O. W. could transact the business with its own means which the Insurance Company was organized to conduct, a debate, that purchasing its stock is an investment, would be more pardonable. This court has held, in *Allison v. Fidelity Mutual Fire Ins. Co.,* 81 Neb. 494, that a mutual fire insurance company has no power to write reinsurance. It would naturally follow that such company could not with its own means incorporate another company which could reinsure.

Appellants contend that the law pertaining to ordinary corporations and mutual insurance companies does not apply to fraternals. That may be admitted as a general proposition, but we are holding in this case that a fraternal cannot transact business which is foreign to its avowed purposes in accordance with the statutes of the state. That being true, the general principles of law relating to that subject are applicable to all corporations. Aside from that, section 95 of the constitution and by-laws of W. O. W. prescribes what investments shall be made.

The effect of this transaction was to put $2,000,000 belonging to W. O. W. at work to finance a Delaware corporation, the articles of which authorize it to transact many kinds of business, such as all kinds of insurance, reinsure and coinsure, own and sell certain enumerated securities, to manufacture, hold, own, mortgage, pledge, sell, transfer and dispose of, and to deal and trade in goods, wares, merchandise and personal property; to acquire good will, rights and property; to guarantee, purchase or acquire, hold, sell or assign shares of capital stock or evidences of

indebtedness created by other corporations; to deal in licenses, patents, inventions, improvements, processes, formulas, trade-names; to make and perform contracts of every kind for any lawful'purpose without limit; to make, accept, indorse or discount notes, drafts, bills of exchange, warrants, debentures and other negotiable instruments; to issue bonds, debentures or obligations; to carry on any other business, and other miscellaneous powers. Not one of those powers is within the leap of a fraternal insurance order as prescribed by the laws of the state of Nebraska or the constitution and laws of W. O. W. The adroit argument of appellants' counsel that the legislature has not conferred powers on fraternal associations, such as a grant or franchise, but assumes a "state of affairs" only "imposing regulations upon them," and does not purport to grant them all the powers which they may use, is disposed of by what has already been said.

It was not until the articles of incorporation were filed in Nebraska, November 14, 1927, that members could know what was going to be, and what had been, done. What was published in the August "Sovereign Visitor" gave no account of the plans. The publication in the "Visitor" of the "Los Angeles News" article was not enlightening, and was not published as—indeed, did not purport to be—a comprehensive report of the Camp proceedings. Had members read the resolution, its provisions would have advised them that the Sovereign Executive officers would attend to "details" necessary to protect W. O. W., in having "at all times fourteen" of "not to exceed twenty-one members" of the board of directors of the Insurance Company, which was never done.

The next effort to notify members of what had been done was a letter, dated December 10, 1927, extending to them the privilege of buying stock until January 1, 1928. There is no such limitation in the resolution. There must have been some underlying purpose.

This suit was filed December 23, 1927, thirteen days after the letter was mailed to members.

At no time were the members given adequate explanations of where the scheme might land. The same men were at the helm for W. O. W. and the proposed Insurance Company from and after June 16, 1927. They contracted with themselves. They were left alone to keep their own counsels, without supervision. "What has he to do with contracts who can command, who is master by nature, who comes on the scene with * * * demeanor?" Those who plead laches are the same who stood behind their tenacious barricade of seclusion and now solicit immunity because not discovered with sufficient alacrity to ward off the blows of legal acrobats. We are not prepared to say, as a matter of law, plaintiffs are precluded by their own laches to maintain this suit, but do conclude, as a matter of fact, they are not.

We own to the rule that laches, the creature of equity, will prevent relief, after the consummation of an *ultra vires* act, even though it be technically expedient and proper, where, to grant it will occasion the public great inconvenience and the defendant serious loss, if the plaintiff can be readily compensated in damages. Courts will balance equities and, where they are equal or predominate against him who seeks relief, equity will follow that rule. So far as appears, there are but few policyholders, who took insurance prior to this suit, to be affected, some of whom were aware of the situation. Men may not interject themselves into, or intermeddle with, situations to aid wrongdoing, and escape the consequences.

Aside from what has been said, it appears that, before complete connections can be made to tie the W. O. W. and Insurance Company together, something more must be done.

In balancing equities, we must take into consideration the good that may be done to those who have been wronged, against the evil that may befall innocent persons. The plaintiffs sued, not only for themselves, but for all those members of W. O. W. who are similarly situated, who

are carrying insurance in about the sum of $750,000,000, as they had the right to do under section 8543, Comp. St. 1922. Section 95, Constitution and Laws of W. O. W., provides: "When funds have accumulated not immediately needed to pay the obligations of the association," they "may be used for the payment of benefits and monument obligations," and that, "if the uninvested fund on hand, together with said one instalment of assessment and beneficiary funds on hand, are not sufficient to pay such approved beneficiary and monument obligations, then the Sovereign Commander and Sovereign Clerk shall convert so much of the invested fund into money as may be sufficient to meet the excess of losses over that which the said one instalment of assessment, together with the beneficiary fund and uninvested funds on hand, will pay, which shall be transferred to and placed in the beneficiary fund." That means that the $2,000,000 expended to incorporate the Insurance Company, being in excess of W. O. W.'s needs as a surplus, could have been transferred to the beneficiary fund to relieve the members of an assessment to raise that amount.

If W. O. W. receives back the $2,000,000, it will not be injured. If the Insurance Company is required to pay back $2,000,000, it cannot complain, since it knew all about the unlawful act by which W. O. W. transferred $2,000,-000 of its funds. The officers of both corporations engineered and transacted the whole deal, which imparts knowledge to them of everything that had transpired.

As to stock resold to members of W. O. W. by W. O. W., such purchasers are in no position to claim innocence. They were members of W. O. W., or they could not have properly purchased the stock. Their membership in W. O. W. imparted notice to them of the constitution and laws of W. O. W., and they must know the law relating to fraternals in Nebraska. We fail to see where any legal or equitable injustice can befall W. O. W., Insurance Company, or members of W. O. W. who purchased with knowledge.

There remains the equities of those who took insurance in Insurance Company. Some of the members of W. O. W. who purchased stock took insurance in the Insurance Company, either to themselves or group insurance on persons in their employ. Such policyholders are without equity. Who the other policyholders are, and when they purchased their policies, are not disclosed by the record. Insurance Company received premiums amounting to $10,677.20 up to January 1, 1928. How much of that sum was received before the commencement of this suit, we do not know. From January 4, 1928, until April 18, 1928, it received premiums amounting to $20,672.31, making a total of $31,-349.51. When the equities are so overwhelming in favor of the members of W. O. W., of the W. O. W. itself, certain of its policyholders and members who purchased its stock, and against Insurance Company, we are not disposed to find such injuries to innocent parties, if there be such, as to deny equitable relief. We may add that we have no knowledge as to who are the parties denominated innocent policyholders, in so far as the record discloses. Of this we are quite certain: That a large part of the premiums were paid for policies by persons who had knowledge of sufficient facts, by virtue of their membership in W. O. W. and of their early participation in the plans of organizing the Insurance Company, as to leave the number of innocent policyholders, if any, in doubt.

It is claimed that the plaintiffs may not maintain this action because they have sued W. O. W. and its officers in violation of section 57 "Eighth," Constitution and Laws of W. O. W. We need give little attention to this point, since this action is brought against W. O. W. and its officers because of the resolution of June, 1927, purporting to authorize the officers to organize the Insurance Company. There is no appeal from acts of the Sovereign Camp. Aside from that, this record shows, a state of affairs which is conclusive, to our minds, that, had the plaintiff waited until the scheduled Sovereign Camp meeting in February, 1928, their complaint would have fallen on deaf ears, and the law does

not require the doing of idle things. Moreover, had plaintiffs waited until February, 1928, they would have been confronted with intervening possibilities which might have arisen to confound them far beyond what appellants now claim should result in their defeat in this suit.

What we have already said disposes of the question of *ultra vires*.

On the question of consolidation under the act of the legislature of 1925, we say: In the instant case, there is no pretense that W. O. W. attempted to consolidate or reinsure, or that the method of consolidation therein provided was ever thought of. In appellants' brief, it is said: "Until authorized by law, fraternals were not allowed to consolidate." This is quite a concession, in the face of the other contention that W. O. W. was free to do as it pleased, by virtue of being a self-governing legislative organization. Again, in appellants' brief: "The W. O. W. was attempting, by organizing the Globe Life Insurance Company, to extend its operations." That being true, it was attempting to indirectly write old line insurance, which it could not do directly without first embracing the general insurance laws of the state, by methods provided by law. The test to be applied here is the misuse of W. O. W.'s funds, and not its right to consolidate with an existing company. If it had been the purpose of the officers of W. O. W. to either consolidate or organize another company, why were not the provisions of those acts followed, or attempted to be followed? There is in no sense a consolidation. Members owning stock in the Insurance Company can dispose of it as they please, provided they first offer it to the Insurance Company. This position is reinforced by a frank admission in appellants' brief: "It must be admitted that the fraternal society in this case did not make a direct attempt to comply with the 1925 law, since its officers and governing body were convinced that they had authority to do what they did do, by reason of the general provision and policy of the law, giving fraternals, through their representative body, wide latitude in investments."

Under no definition of the word "consolidation" do the facts before us fit. Both corporations are acting under laws of different states, under different charters, names, management, kinds of business and officers; and any business they transact with each other is as much subject to future arrangement as though nothing had been done tending to form ties between them.

There was no consolidation, either by a new and distinct corporation; the absorption of one by the other; issuing shares in one to the shareholders in the other in exchange; making one company the holder of all in the other company, or by regarding the united shareholders of both companies as shareholders in each corporation, acting under similar charters and under the same management, so as to bring about consolidation, merger or amalgamation, as suggested in *Tod v. Kentucky Union Land Co.*, 57 Fed. 47, cited by appellants.

We do not think authorities cited, holding that one profit corporation may buy stock in a similar corporation, are in point; nor do we think this is a case involving laches or estoppel, as in *Leininger v. North American Nat. Life Ins. Co.*, 115 Neb. 801. In that case, there was a transformation of a mutual to a stock company, confessedly under specific acts of the legislature prescribing the course to be followed. Every move was a substantial compliance with law, which provided an appeal by aggrieved members. After the transaction was fully completed and no appeal taken, suit was commenced to unscramble the egg. In the instant case, we have a corporation taking funds from W. O. W. for its entire capital stock, without authority of law, and launching its own separate business, with such credit and standing as it could secure from persons doing business with it. Its obligations are its own. It makes its own contracts, to meet which it pledged its own credit. Its policyholders could not look to W. O. W. or its members for payment of money that W. O. W. could not divert therefor. It received money from the officers of the W. O. W. who could not ratify such acts. Those

who dealt with the Insurance Company must look to it alone. We do not pretend to dissolve the Insurance Company or create anew the W. O. W.; nor do we separate that which has never been joined.

We have examined all of the propositions of law urged by appellants, and have read many of the citations following each, and find nothing in them to lead us to a different conclusion than herein expressed.

The only remaining question for consideration is whether there has been error in the amount of the decree. We think the decree, when properly construed, does not prejudice any of the defendants. It seems to require nothing more than a complete restoration of cash and securities, according to the necessities of the occasion and the facts.

The decree of the district court should be and is

AFFIRMED.