Public Service Commission,<br>
Feb. 7, 1950. } No. 3899.

## PETITION OF WHITE MOUNTAIN POWER CO. & a.

146

*Morse & Grant* and *Thomas L. Marble* (*Mr. Morse* orally), for White Mountain Power Company.

*Tobey & Zellers* and *Louis Gorrin*, of the District of Columbia (*Mr. Zellers* orally), for New Hampshire Electric Cooperative, Inc.

*William L. Phinney*, Attorney General and *William S. Green*, Assistant Attorney General (*Mr. Green* orally), for the State and the Public Service Commission.

DUNCAN, J. The statute pursuant to which the certified question is transferred provides as follows: "QUESTIONS OF LAW. The commission may at any time reserve, certify and transfer to the supreme court for decision any question of law arising during the hearing of any matter before the commission." R. L., c. 287, s. 20. The petitioners suggest that the question need not be answered because it is not a question "arising during the hearing of any matter before the commission," and because this court does not commonly determine questions of law which "may not arise when all the facts are found." *Connecticut Valley Lumber Co.* v. *Monroe*, 71 N. H. 473, 474. We cannot adopt this view.

The occasion for the certified question is apparent upon the face of the petition only as the joint petition alleges that the cooperative will become an "affiliate" within the meaning of R. L., c. 305, upon its acquisition of the power company securities. While this is not an essential allegation because the cooperative became an affiliate merely

by entering into the agreement of which approval is sought (R. L., *c.* 305, *s.* 1, *par.* II, c), it is an indication that performance will take place when the parties may no longer be dealing at arms length, a prospect which the Commission may rightly take into account in acting upon the petition, if ownership of the securities by the cooperative is permissible.

While the precise issues presented by the petitions might be determined without regard to the certified question, nevertheless justification for the transfer appears in the record. The testimony leaves no room for doubt that the authority sought by the petitions will be utilized by the petitioners only if the securities of the power company may be acquired by the cooperative. The proposed loans to both companies are contingent upon such acquisition. Construction of the extensions for which it is proposed that the power company shall furnish power and maintenance is contingent upon the loan to the cooperative. In language which a witness for the cooperative adopted, "everything is tied together in the entire transaction," and "this deal is all one transaction rather than three separate transactions." Thus if the securities may not lawfully be transferred, determination of the questions of fact presented by the petitions will be of service to no one. The question certified strikes to the heart of the transactions which occasion the petitions, and the inquiries concerning these transactions which were made at the hearing could have left little doubt in the minds of the parties that the question of their propriety was one "arising during the hearing" of matters before the Commission.

We do not consider it essential to effective certification that the transfer be made during the hearing, and before its conclusion. The statute expressly provides that the Commission may "at any time" transfer a question arising during a hearing before it.

It is true that should findings adverse to the petitioners result in a denial of the several petitions, the question certified would become moot, at least so far as these proceedings are concerned. It does not follow, however, that a determination of the transferred question would not "aid in the proceedings" before the Commission. See *Watkins* v. *Railroad*, 80 N. H. 468, 469. The facts which bear upon the question are not disputed, and no findings of fact are necessary to a determination of the issue which it presents. If a negative answer is required, denial of the several petitions might well be warranted because of their dependency upon the transfer of ownership. In the circumstances, the question may properly be answered.

No claim is made on behalf of the State that acquisition of the

power company securities by the cooperative will be unlawful for want of approval of the transfer by the Public Service Commission. The jurisdiction of the Commission is restricted by statute to authorization of the acquisition of securities by a public utility. R. L., c. 289, s. 31. By the provisions of R. L., c. 273, s. 56, the cooperative is "exempt from the jurisdiction of the public service commission." The certified question accordingly depends wholly upon the corporate authority granted the cooperative by the chapter of the Revised Laws cited in the question.

The particular provisions of chapter 273 under which the cooperative was organized confer upon an association incorporated thereunder the power, among others, to acquire transmit, distribute and sell electric energy to its members "and to other persons not in excess of ten per cent of the number of its members." R. L., c. 273, s. 52, I. It authorizes such a cooperative to purchase, own and hold electric transmission and distribution lines, "and any and all kinds and classes of real or personal property whatsoever, which shall be deemed necessary, convenient, or appropriate to accomplish the purpose for which the co-operative is organized" (s. 52, III). An electric cooperative is further authorized to have and exercise any and all other powers which may be necessary, convenient or appropriate to accomplish the same purpose (s. 52, VIII).

By section 53 of the chapter such cooperatives are also granted "all of the powers and privileges of co-operatives organized under any other provisions of this chapter." These powers are expressly set forth in section 3 of the chapter. Among them is the power "to purchase or otherwise acquire, to exercise all rights of ownership or control in and to sell, transfer, or pledge . . . shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the . . . handling, or marketing of any of the products handled by the association" (s. 3, VI). There is also granted the power "to establish reserves and to invest the funds thereof in bonds or in such other property as may be provided in the by-laws" (s. 3, VII), and finally, "any other rights, powers, and privileges granted by the laws of this state to corporations organized under the general laws of this state, except such as are inconsistent with the express provisions of this chapter. . . . " (s. 3, XI). In connection with the latter provision it may be noted that a business corporation is authorized to hold shares, bonds and securities of other corporations, as the purposes of the corporation may require. R. L., c. 274, s. 4, V. See note, 31 Col. L. Rev. 281, 284.

In view of the powers thus conferred upon the cooperative, there can be no doubt that the statute allows it to acquire and own the securities of the power company and to exercise all rights of control which any owner of such corporate securities might lawfully exercise, unless the power to do so is elsewhere expressly withheld, or is inconsistent with other express provisions of the act. It is upon other provisions which the State founds it argument and to these we now advert. Certain of the provisions are found in section 52, I, of chapter 273, *supra*. It is there provided that no person shall become a member of a cooperative unless he agrees to use electricity furnished by the cooperative, and that he shall cease to be a member if he refuses service so furnished, or if the cooperative fails to furnish it; "provided, however, that such service shall be rendered only to persons residing on premises not receiving central station service on June 16, 1939, and to such other persons as the public service commission may find . . . that it is in the public interest that such association should render such service." Similarly, section 55 indicates that the persons entitled to be admitted to membership are those who are "not receiving central station service."

It is suggested that the proposed transfer of securities will permit the cooperative to defeat the legislative purpose which prompted this restriction of service by electric cooperatives primarily to its members, and of their membership primarily to persons without prior utility service. Analysis of the legislation does not support this view. The restrictions imposed are both related to the statutory exemption of cooperatives from general commission regulation. By requiring that the greatest proportion of its consumers shall be members, the Legislature ensured control of the corporation by those most interested in the quality and cost of its service. The provision was calculated to make certain that regulation by public authority in the interest of the consumers should be relinquished only in favor of the regulation by the consumers themselves which would be prompted by their own self interests. The restriction upon membership was calculated to achieve a twofold result: first, to direct the activity of the corporation toward the function which it was created to serve, namely, the provision of service to unserved rural areas; and second, to prevent wasteful competition with existing, regulated monopolies, no duplication of whose services the public good was thought to require.

If not all of these purposes will be furthered by the proposed security transfer, still it is not apparent that any of them will be subverted. Emphasis is laid by the State upon the fact that the "electric utility

business . . . has been for many years the subject of strict governmental regulation" which is "designed to prevent exploitation of the public and competition amongst utilities leading to disorder, duplication, and waste." If we grant this to be so, there still remains to be demonstrated that ownership of the power company securities by the cooperative will do violence to the purpose or scheme of regulation from which the cooperative has been expressly exempted. The transfer of the securities to the cooperative as owner will not alter the character of the power company as a public utility. It will continue to serve its customers and to do so subject to regulation by the Commission. No opportunity for "exploitation of the public" will be afforded; no competition with existing utilities "leading to . . . duplication and waste" will result. On the contrary, acquisition is sought by the cooperative for the professed purpose of facilitating service by the cooperative itself to rural residents now unserved, by permitting it to avoid or dispense with duplication of transmission lines and other facilities. So far as customers of the power company are concerned, they will continue to have the protection of public regulation. The service furnished by the power company in 1939, and presently, will neither be replaced nor subjected to competition by the service of the cooperative.

We therefore find no basis in the statute for drawing the conclusion that although the Legislature expressly authorized electric cooperatives to own the securities of "any corporation engaged in any related activity," it intended that the securities of a public utility should be excepted. In consequence, we think that no occasion is presented to disregard the corporate entity of the power company in order to hold that the cooperative proposes to serve persons which the statute does not permit it to serve. Cf. *Higgins* v. *Smith*, 308 U. S. 473, 477. What is denied by the statute is the right to serve substantial numbers of non-members without the restrictions of public regulation. This right will not be gained by acquisition of the power company securities. If it may be said that in reality the cooperative will be serving power company customers, yet it will not be permitted to do so without regulation. If in a sense it will be doing indirectly what it is forbidden to do directly, it is sufficient to say that the doing by indirection is not prohibited, but permitted subject to regulation. See *United States* v. *Cumberland Pub. Serv. Co.*, 70 S. Ct. 280; *Berkey* v. *Third Ave. Ry. Co.*, 244 N. Y. 84.

Granted that the corporate fiction may be disregarded where it is used to circumvent the requirements of established public policy (see

*Folts* v. *Globe Life Ins. Co.*, 117 Neb. 723, 742), here we find neither legislative declaration nor implication of any policy that utility securities shall not be held by cooperatives. If such a policy is thought to be desirable, whether for the purpose of forestalling such possibilities of government control of utilities as are apparent in the "circumstances disclosed in the accompanying record," or for some other reason, the establishment of such a policy rests with the Legislature, not the courts. Cf. Mass. G. L. (1932), *c.* 156, *s.* 5. See *State ex rel. etc.* v. *Pub. Serv. Comm.*, 352 Mo. 905, 924.

There remains to be considered the contention that ownership of the power company securities by the cooperative will violate the "underlying basic policies of non-profit, cooperative enterprise." Ownership of the securities will presumably be accompanied by the receipt of interest and dividends by the owner. This, it is suggested would violate the provision of R. L., *c.* 273, *s.* 1, V that "associations organized hereunder shall be deemed non-profit"; and it is said that the members of the cooperative would "assume the role of investing stockholders in a non-member enterprise and [the cooperative] would become a commercial organization engaged in business 'for profit to itself at the expense of a consuming public which would have no voice in the management of its affairs.' *Inland Empire etc.* v. *Dept Pub. Service* [199 Wash. 527, 539.]"

In general it may be recognized that the character of a cooperative is commonly considered to be that described in *Inland Empire etc.* v. *Dept. of Pub. Serv.*, 199 Wash. 527, 539, 540, quoted by the State: "[I]t functions entirely on a cooperative basis . . . through which the users of a particular service . . . operate the facilities which they themselves own. The service, which is supplied only to members, is at cost, since surplus receipts are returned ratably according to the amount of each member's consumption." While the by-laws of the New Hampshire Electric Cooperative are not before us, it does not appear to be disputed that its present operations conform in general to the procedures described in the quoted case. It appears that upon consummation of the proposed transfer, the income from the power company securities will be applied to repayment of the borrowed purchase price. Presumably, upon satisfaction of this indebtedness, the income will become available for other uses by the cooperative, or for distribution to its members, either by reduction of the cost of service supplied, or by some other means. The question is whether this will be so far *ultra vires* of the cooperative as to make ownership illegal. The precise meaning of section 1, V, is nowhere defined in the act.

Similar provisions have been criticized as "ambiguous, if not meaningless." Evans & Stokdyk, The Law of Co-operative Marketing, 237. The proposed investment and any resulting income will do no violence to the "theoretical concept of a co-operative as an association serving only members, and 'non-profit' (in the sense that all profit goes to its members rather than investors)." Schneider, Cooperatively Owned Utilities, 1939 Wis. L. Rev. 409, 410. See *Manchester Dairy System, Inc.* v. *Hayward*, 82 N. H. 193, 194, 199. We are not directly concerned with the question of whether such income will be subject to income tax, as plainly it may be. See *Penn Mutual Co.* v. *Lederer*, 252 U. S. 523, 534; Cf. Packel, The Law of Cooperatives, (2d ed.) *s.* 62 (c) at 249. But even profits may be distributed upon a non-profit basis. See *Farmer's Union Co-op. Co.* v. *Com'r of Int. Rev.*, 90 F. (2d) 488; *San Joaquin V. P. Producers' Ass'n* v. *Com'r of Int. Rev.*, 136 F. (2d) 382. And in a sense, a saving of expense is a profit. *State* v. *Lumbermen's Clinic*, 186 Wash. 384, 394. Cf. R. L., *c.* 334. What distinguishes the cooperative, among other things, is the absence of "capital profit," and the fact that "capital investment receives no return or a limited return" which passes "to the associates on a substantially equal basis or on the basis of their patronage of the association." Packel, *supra*, 3, 4. See also, Peer, Cooperatives and Proprietary Corporations, 34 Cornell L. Rev. 416, 417.

Whether the provision of section 1 precludes a transaction which will result in profit or income to the cooperative association finds its answer in other provisions of the statute which indicate that it does not. Cooperatives are authorized to "exercise all rights of ownership . . . in capital stock, or bonds of any corporation . . . engaged in any related activity" (*s.* 3, VI, *supra*). They are authorized to establish reserves and to invest the funds thereof in bonds or other property. (*Id.*, VII). Surely the Legislature did not intend that no income should be derived from such ownership or investment. Cooperatives may be required to render reports to the Commissioner of Agriculture which shall state among "other facts bearing upon the financial condition of the association," its "profits" (*s.* 40). Construed as a whole, the legislation compels the conclusion that the element of "non-profit" prescribed by section 1 was intended in the broad sense "that all profit goes to its members rather than investors" (Schneider, *op. cit. supra*), and not as a limitation upon the powers of the corporation.

The question certified is answered in the affirmative. It is obvious that this answer is not determinative of the merits of the pending

petitions. Whether the proposed issue of securities by the power company is consistent with the public good (R. L., c. 291, s. 4), whether the reasonableness of the contract between the petitioners has been established (R. L., c. 305, s. 4), and whether construction of the proposed extensions by the cooperative should be approved (Laws 1947, c. 98) remain to be determined by the Commission.

*Case discharged.*

BLANDIN and LAMPRON, JJ., dissented: the others concurred.

BLANDIN, J., *dissenting:* The majority opinion holds that form governs substance and that incidental powers override basic limitations. I cannot subscribe to this. It would permit this nonprofit cooperative to own, operate, and derive profit from any or all the electric public utilities in the state by ownership of all their stock. The petitioners admitted, and it is concededly the law which the majority opinion does not deny, that the cooperative could not legally purchase outright the physical assets of the White Mountain Power Company and serve the customers of that concern. Yet the opinion allows the cooperative to own and control all these same physical assets and serve all the same customers by ownership of all the stock of the power company. If this is sound doctrine there is no legal obstacle to this non-profit cooperative owning and controlling all the electric power utilities in the state. I do not believe the Legislature intended this.

The opinion reaches this result by holding, first, that the incidental power to own stock granted by R. L., c. 273, ss. 3, 53, controls the limitations on the powers of the cooperative stated in the section which created it. R. L., c. 273, s. 52, I. Second, it says that, since no improper object is sought by this method for obtaining control over the power company the corporate fiction must be upheld, and the fact that actually the cooperative owns all the physical assets of the company and serves all its customers must be ignored. Not only does this upholding of the fiction that a corporation is a being independent of those who are associated as its stockholders run contrary to our law (*Sunapee Dam Company* v. *Alexander*, 87 N. H. 397, 401), but the proposition as a whole misconceives the vital issue of legislative intent. I shall not attempt to read the legislative mind of more than a decade ago, as does the majority opinion, to the extent of deciding what all its objectives were when it passed this law. However, the

act is headed "Associations for Rural Electrification" and it limits, for the purposes of this case, service by the cooperative to outsiders not in excess of 10% of its membership, and to those not receiving central station service on June 16, 1939. I am unable to believe that this authorizes or was intended to authorize this nonprofit cooperative to take over any or all electric public utility businesses in New Hampshire and in reality to engage in the business of making profits.

The majority recognize that their opinion paves the way for complete State or more likely Federal control over all our utilities. They say this is a matter for the Legislature and not for the court to decide. I agree with them. They go on to say, in effect, that the Legislature has decided that by such means as used here the cooperative or its backer the Federal Government may gain ownership and control of property which admittedly it could not otherwise lawfully obtain. I do not believe the Legislature has so decided. I would therefore answer no to the certified question which I agree is properly before us.

LAMPRON, J., authorized me to say that he concurs in this dissenting opinion.