## First Trust Company of Lincoln, Appellee, v. Carl C. Carlsen et al., Appellants.

Filed May 17, 1935.   No. 29272.

*Frank A. Peterson* and *Perry, Van Pelt & Marti,* for appellants.

*Beghtol, Foe & Rankin, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

CARTER, J.

This is an action at law brought by the appellee, First Trust Company, as successor trustee of the Lincoln Trust Company, against the appellants for damages for the breach of a trust agreement in which the Lincoln Trust Company was named as trustee. The jury returned a verdict for appellee for $28,867, and judgment was entered for that amount. Each of the appellants filed a motion for a new trial, from the overruling of which this appeal is taken.

The record discloses that the Lincoln Trust Company was organized as a trust company with its principal place of business at Lincoln, Nebraska, and that its operations were directed and controlled by a board of directors, an executive committee, a loan committee and various officers including a president, vice-president and trust officer. The appellant Carl C. Carlsen was president, a director and member of the executive and loan committees. The appellant John A. Reichenbach was vice-president, a director and member of both committees heretofore mentioned. The appellant William R. Mellor was trust officer, a director and member of both committees; and the appellant Paul H. Holm was a director and member of the executive and loan committees.

The record further discloses that the Lincoln Safe Deposit Company was a corporation authorized to own and hold real estate. It was a holding company for the Lincoln Trust Company and was owned and managed by the officers, directors and stockholders of that company.

It appears from the evidence in this case that on June 30, 1919, the Lincoln Safe Deposit Company loaned Webb Kellogg the sum of $45,000 and took as security therefor a mortgage for a like amount on 480 acres on land in Dixon county, Nebraska, due March 1, 1925. The bonds accompanying the mortgage were sold to customers of the Lincoln Trust Company. This suit is brought by the First Trust Company for the benefit of the present owners of these bonds.

The mortgage contained the following provision: "And it is further agreed herein, by and between said parties, their heirs, devisees, administrators, executors and assigns, that whenever any of the bonds hereby secured, shall have passed into other hands than said mortgagee, by indorsement, assignment or otherwise, then and in that case, the Lincoln Trust Company, is hereby constituted a trustee, to demand payment thereof, both principal and interest; to demand payment also of any and all losses occasioned by or through insurance or otherwise; to bring actions at law for the recovery thereof; and to foreclose this mortgage for and on account of breach in its conditions; and when any money as above mentioned shall have come into the hands of said trustee, to disburse the same as required; and, generally, under said trust to do and to perform each and every act in respect of said indebtedness that said mortgagee could do and perform."

On January 12, 1920, Webb Kellogg sold the lands covered by the mortgage to J. F. Whittemore, subject to the mortgage lien of $45,000. On August 18, 1922, Whittemore conveyed said lands to the Farmers National Bank at Wakefield, subject to the $45,000 mortgage, and on January 31, 1925, the Farmers National Bank conveyed the land to R. H. Mathewson subject to the same lien. On February 2, 1925, Mathewson entered into an extension agreement with the Lincoln Safe Deposit Company whereby the loan was extended to March 1, 1930. The outstanding bonds were called in and a copy of the extension agreement and interest coupons for the additional five-year period were attached to the original bonds. The

interest coupons thus attached all bore the signatures of R. H. Mathewson and Elizabeth M. Mathewson. On February 26, 1925, Mathewson conveyed the land back to the Farmers National Bank of Wakefield subject to the mortgage of $45,000. The Farmers National Bank of Wakefield subsequently became insolvent and was placed in the hands of a receiver. On August 16, 1929, the receiver conveyed said lands to the Lincoln Trust Company for a consideration of $25 subject to the mortgage of $45,000. On March 1, 1929, a default in the payment of interest occurred and the same was advanced by the Lincoln Trust Company. On November 15, 1929, the Lincoln Trust Company conveyed the mortgaged premises to the Lincoln Safe Deposit Company subject to the mortgage for $45,000, but did not have the deed recorded. On or about March 1, 1930, some person connected with the Lincoln Trust Company caused certain coupons to be prepared bearing the unauthorized facsimile signatures of Webb Kellogg and Margaret Kellogg and caused them to be attached to the original bonds. Advancements were made to pay interest coupons falling due on and prior to September 1, 1931, but after this date no further interest was paid. On July 9, 1932, the Lincoln Trust Company and the Lincoln Safe Deposit Company were adjudged bankrupts by the United States district court, district of Nebraska. On September 7, 1932, the deed conveying the mortgaged premises from the Lincoln Trust Company to the Lincoln Safe Deposit Company was placed of record by the trustee in bankruptcy.

The appellee contends that it was the duty of all the appellants by virtue of their offices to deal honestly and fairly with persons having relations with the Lincoln Trust Company; to diligently protect the interests of beneficiaries of trusts; to abstain from profiting personally or from permitting the Lincoln Trust Company to profit from trust relations; and to conduct the business of the Lincoln Trust Company so as not to defraud beneficiaries of trusts. The allegations of the petition are to the effect that the appellants failed to perform the duties required

of them by law and the prayer is for the damages resulting to the beneficiaries of the trust.

The answers of the appellants allege in substance that the conveyance of the mortgaged premises to the Lincoln Trust Company was for the benefit of bondholders and that the holders of the bonds acquired and still have a valid lien on the premises; that the value of the security was in excess of the amount of indebtedness and that the extensions of the mortgage granted by the Lincoln Trust Company or the Lincoln Safe Deposit Company deprived the bondholders of no rights under the mortgage and therefore did not cause them a loss.

The reply denies that the security of the mortgage was not impaired or lost by the conduct of the Lincoln Trust Company and the Lincoln Safe Deposit Company; denies, also, that the mortgage is still a lien on the lands covered by the mortgage and that the bonds are valid and enforceable obligations; and alleges that by the fraudulent manipulation of said bonds by the appellants, as officers and directors of the Lincoln Trust Company and the Lincoln Safe Deposit Company, the bonds were avoided and the mortgage lien extinguished.

The evidence is not disputed that the original loan of $45,000 was made and the mortgage taken on the 480 acres of Dixon county land prior to the date that the appellants became officers and directors of the Lincoln Trust Company. The matter first came before them on or about March 1, 1925, when a five-year extension of the loan was applied for. The application for the extension was approved by the appellants Carlsen, Mellor and Reichenbach. The extension agreement was entered into with the then owner and copies of the same were attached to each of the outstanding bonds. Each of the coupons attached to the orginal bonds was signed by Mathewson and his wife as owners. They were all subsequently presented at the office of the Lincoln Safe Deposit Company and paid. It is clear that the bondholders did not authorize the extension of the loan from March 1, 1925, to March 1, 1930, but it is equally clear that they approved

and ratified the action of the trustee in so doing. A copy of the extension agreement was attached to each bond and there is no contention that the copies did not state the actual agreement. The bondholders accepted them without objection. The coupons attached were signed by the then owners and they showed that the owner was a different person than the original mortgagor. The bondholders accepted the coupons, retained them without objection, and subsequently presented them for payment and they were paid in full. The bondholders cannot now be heard to complain that the extension agreement was unauthorized and constituted a breach of trust. The unauthorized action of the trustee in extending the maturity date of the loan to March 1, 1930, was completely and fully ratified by the bondholders. It is therefore clear that the mortgage was a valid and enforceable lien at this time and properly extended to March 1, 1930.

The interest coupons were paid up to, but not including, March 1, 1929, by the owner of the security. The interest due on March 1, 1929, was not paid by the owner of the real estate, but the same was advanced by the Lincoln Trust Company. There was no duty on the part of the Lincoln Trust Company to make this payment of interest or of any of the subsequent payments that came due. The failure of the owner of the mortgaged lands to pay the interest on March 1, 1929, was a default under the terms of the mortgage and it became the duty of the trustee to follow the provisions of the trust agreement in protecting the beneficiaries of the trust. Bondholders were entitled to notice of this default, which they did not receive. The payment of the interest coupons by the Lincoln Trust Company effectually concealed from bondholders the fact that there was a default. The subsequent action of the Lincoln Trust Company and Lincoln Safe Deposit Company in causing unauthorized coupons to be attached to the original bonds further concealed the fact that the owner of the mortgage was not paying his interest. The Lincoln Trust Company was also advancing funds for the payment of

taxes and other items of expense, which fact was never communicated to the bondholders. It is clear therefore that the Lincoln Trust Company and the Lincoln Safe Deposit Company pursued a course of action that could have been very detrimental to the interests of bondholders.

In the case of *First Trust Co. v. Ricketts,* 75 Fed. (2d) 309, involving the same trustee as in the case at bar, Sanborn, J., summarizes a like situation in the following apt language: "The failure of the bankrupt to notify the bondholders of default and of the failure of the mortgagor to pay interest is attributable to only one thing, and that is the desire of the bankrupt to maintain a market for the securities which it was selling. * * * It might not be fair, upon this record, to say that the bankrupt in this case had dug a pit and was anxiously keeping the pathway to it in good order, but it is very apparent that it had no desire to place any obstructions in the beaten pathway to its door. Its advancing of interest to its customers is to be attributed to a desire on its part to preserve an unimpaired market for its mortgage bonds, rather than to a desire to confer a boon upon them by purchasing their interest coupons."

We find no evidence, however, that would sustain the theory of the appellee that the mortgage lien had been lost or that the bonds were void and unenforceable. We are therefore of the opinion, and we so hold, that the appellants are liable for any damages sustained by the appellee as trustee for bondholders in not foreclosing the mortgage after the default occurring on March 1, 1929, and for failure to give notice to bondholders of this default in order that they might have taken action to protect themselves had they so desired.

The duty of a trustee to the beneficiaries of the trust are concisely stated in 3 Pomeroy, Equity Jurisprudence (4th ed.) sec. 1066, as follows: "The second branch of the trustee's obligation is to use care and diligence in the discharge of his functions. This duty is very comprehensive; it extends through the entire range of his

conduct; it is entirely independent of the question of good faith, for he will be liable for its failure even when no wrongful intent nor violation of good faith is charged upon him. He may be liable for its neglect by being held answerable for property actually lost through want of care or prudence, and also for moneys which he might have received if he had exercised due care, prudence, and judgment in his investments and other dealings with the trust estate."

The duty of the Lincoln Trust Company and the Lincoln Safe Deposit Company to the beneficiaries of the trust, as evidenced by the trust agreement already referred to, is quite analogous to the rules of agency thus expressed: "It is always the duty of an agent, as will be more fully seen hereafter, to fully inform the principal of all facts relating to the subject-matter of the agency which come to the knowledge of the agent, and which it is material for the principal to know for the protection of his interests. This duty, moreover, has a specific application in this connection which justifies a reference to it here. As has already been seen, it is absolutely essential, when an agent undertakes to sustain dealings with his own principal, that it shall appear that the agent frankly and freely gave to his principal full information respecting, not only the agent's relation to the contract, but also, the various conditions respecting time, value, situation, condition and the like, which may fairly be deemed to be material in determining upon the desirability of entering into the contract.  *  *  *  The law will not permit these important safeguards to be easily defeated. Hence it has been held that the rule that an agent who undertakes to act for his principal may not, without the latter's consent, in the same manner act for himself, cannot be avoided upon the authority of any local or temporary usage of which the principal was ignorant and which he had no reason to anticipate. * * * If, therefore, it does not appear that the principal was fully informed, and *a fortiori* where the agent has practiced concealment, evasion, or misrepresentation, the

126

transaction cannot stand." 1 Meecham, Agency (2d ed.) secs. 1207, 1220, 1221.

The appellee contends that, when the Lincoln Trust Company took title to the mortgaged lands, it became the owner and the mortgage was then merged in the fee title causing a loss of the security to the bondholders. The contention is also made that the purpose of the Lincoln Trust Company in taking title in itself was eventually to pay off the mortgage with its own funds, sell the land to reimburse itself and retain any excess as a profit to the company. To this we cannot agree. This same proposition was raised in the case of *First Trust Co. v. Ricketts, supra,* in which the court in that case said: "It is possible that the bankrupt intended to take title to the mortgaged real estate, to pay the carrying charges, and eventually to pay off the bonds out of its own funds and to sell the land for its own reimbursement, keeping any profit which might accrue from a sale. The fact is, however, that the bankrupt was trustee for the bondholders, that it bore toward them a relation of trust and confidence which the law would not permit it to violate, and that it could not acquire an interest in the trust property adverse to them." The trustee, under the provisions of trust agreement authorizing foreclosure in the event of a default, was authorized to take title to the security for the benefit of the bondholders. The fact that the security was subsequently conveyed to the Lincoln Safe Deposit Company can make no difference in view of our holding herein that, for the purposes of this suit, the Lincoln Trust Company and the Lincoln Safe Deposit Company are in effect identical. As between the bondholders on the one hand and the Lincoln Trust Company and the Lincoln Safe Deposit Company on the other, the relation of trustee and *cestui que trust* has, at all times herein mentioned, been existent and the lands securing the mortgage which were conveyed to the trustee were at all times thereafter held in trust for the benefit of the bondholders.

It might be argued that the appellants Mellor, Reichenbach and Holm had no knowledge of the default of interest occurring on March 1, 1929, and for that reason no liability could attach to them. The facts show, however, that on or about March 1, 1930, the matter of the Kellogg loan was before the loan committee consisting of the four appellants. The evidence is clear that all of the facts pertaining to this loan could have been obtained by them within a very few minutes. Instead of making any kind of an investigation, they approved the attaching of additional coupons when they well knew, or should have known, that an extension agreement had not been entered into. This conduct in directing the affairs of the trustee corporation was a fraudulent concealment of the facts pertaining to the loan which they were under obligation to communicate to the bondholders. In approving the attaching of the unauthorized coupons, they thereby aided and abetted in the concealment of the default occurring on March 1, 1929, and became liable for all damages occurring because thereof.

It has been held by this court in the case of *Dickinson v. Lawson,* 125 Neb. 646, as follows: "The degree of participation in the commission of an actionable tort does not affect the extent of liability, and all persons who instigate, promote, encourage, advise, countenance, cooperate in, aid, or abet the commission of an actionable wrong by another are liable as principals to the party injured to the same extent and in the same manner as if they had performed the wrongful act themselves." In the case of *Ashby v. Peters,* 124 Neb. 131, this court has held: "The officers of a corporation are responsible for the acts of the corporation, and in a suit for fraud, if fraud is proved, the law will look through the corporation to the officers who acted in the matter, and the officers who acted in the premises are proper parties defendant."

A breach of trust has been defined as follows: "It is well settled that every violation by a trustee of a duty which equity lays upon him, whether wilful and fraudu-

lent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust. The term therefore includes every omission or commission which violates in any manner either of the three great obligations already described: Of carrying out the trust according to its terms, of care and diligence in protecting and investing the trust property, and of using perfect good faith. This broad conception of breach of trust, and the liabilities created thereby, are not confined to trustees regularly and legally appointed; they extend to all persons who are acting trustees, or who intermeddle with trust property." 3 Pomeroy, Equity Jurisprudence (4th ed.) sec. 1079.

The facts pertaining to the defaults of interest were not known to the beneficiaries of the trust because of the fraudulent concealment hereinbefore stated. When the Lincoln Trust Company and the Lincoln Safe Deposit Company were adjudicated bankrupt, the beneficiaries of the trust for the first time discovered the fraudulent course of action pursued by these appellants. In this connection, it will be remembered that, as already noted, the Lincoln Trust Company and the Lincoln Safe Deposit Company were identical as to stockholders, ownership, officers and control. They were merely two instrumentalities which the same persons controlled and made use of in effecting the present course of action and in carrying out the fiduciary relations involved therein, created by the mortgage indenture of June 30, 1919. We are of the opinion that the reasoning and principle announced by Rose, J., in *Enos v. Hanff*, 95 Neb. 184, are applicable to the case at bar, viz.: "In a business sense the interests of the controlling factors in both corporations are identical. Where the financial interests * * * are thus united, the court, in furtherance of a public policy established by the legislature, will look beyond the legal entity of a corporation to the relations of the individuals behind it and enforce the law according to its terms." See, also, *State v. Interstate Power Co.*, 118 Neb. 756, and cases cited therein.

The testimony in the instant case, examined from the point of view herein suggested, is certainly ample to sustain the allegations of the petition alleging the employment by appellants of a fraudulent device and ample to justify the submission of the case to a jury.

We are of the opinion that the evidence shows a breach of duty on the part of the Lincoln Trust Company as trustee in the instant case. We are also convinced that the evidence sustains the proposition that the appellants all encouraged, promoted, aided, abetted and cooperated in the course of action that resulted in such breaches of trust. The only question remaining is whether the evidence, viewed in the light of what we have heretofore said in this opinion, will sustain the judgment of $28,867 entered by the trial court.

We are convinced that the damages, if any, suffered by the beneficiaries of the trust were those occasioned on and after March 1, 1929, the date of the default on the first interest payment which the trustee failed to communicate to the bondholders. As has already been said, the lien of the mortgage was at all times valid and enforceable. The bondholders were, however, deprived of the right to foreclose because of the fraudulent concealment of defaults in the payment of interest on the part of these appellants until on or after July 9, 1932, the date that the Lincoln Trust Company and the Lincoln Safe Deposit Company were adjudicated bankrupts. The evidence of the value of the security in 1919, 1922, and 1925 was immaterial and improperly admitted. If the bondholders suffered a loss in their security between March 1, 1929, and the date of filing this action, because of delay in the commencement of the foreclosure proceedings brought about by the fraudulent conduct of these appellants, they are entitled to recover such damage. The evidence of George J. Adams, called as a witness for appellee, is to the effect that the lands secured by the mortgage had a market value of $19,200 to $24,000 in 1930. The witness Adams fixes the market value at the date of the trial at $19,200. The witnesses

called by appellants fix the value in 1930 at $48,000. None of the witnesses called testified to market values in 1929. No competent evidence was offered tending to show damages except losses sustained by the depreciation of the security. Clearly, there is no evidence in the record which under any logical theory could sustain a judgment of $28,867 in the instant case. Under the evidence adduced, the judgment is clearly excessive.

We, therefore, hold that the judgment is not sustained by the evidence and the same is hereby reversed and the cause remanded for a new trial.

REVERSED.