HAROLD S. WHALEY ET AL., APPELLEES, V. JACK MATTHEWS, APPELLANT: COSMOPOLITAN OLD LINE LIFE INSURANCE COMPANY, APPELLEE: HAZEL W. JEWELL ET AL., INTERVENERS, APPELLEES.

280 N. W. 159

FILED JUNE 10, 1938. No. 30151.

*Beghtol, Foe & Rankin,* for appellant.

*Bernard S. Gradwohl* and *Robert G. Simmons, contra.*

Heard before GOSS, C. J., ROSE, DAY, PAINE, CARTER and MESSMORE, JJ.

GOSS, C. J.

The three plaintiffs and three interveners, all holders of certain types of insurance contracts, brought this suit in equity against Jack Matthews and Cosmopolitan Old Line Life Insurance Company, on behalf of themselves and others similarly situated, for breaches of trust and violations of duty. They charged Jack Matthews, president of the company, with wrongful diversion of moneys from various

funds belonging to the company. The result was a judgment against Matthews and the company for $191,300. Matthews alone appealed.

The decree, dated December 10, 1936, shows that the items making up the above total sum of the judgment were: (1) $65,000 removed and overpaid from the cumulative endowment funds and $9,750 interest thereon, making the total of this first item $74,750; (2) $90,000 removed and overpaid from the general fund, plus interest thereon in the sum of $17,250, making the total of this item $107,250; and (3) $9,300 for the negligent and wrongful purchase of securities known as the Neverve mortgages, without securing and examining an abstract of title thereof, which would have revealed prior liens and would have avoided such loss. This makes a grand total of $191,300.

The insurance company had its origin in 1917 or 1918, beginning as Cosmopolitan Club of America, a cooperative investment association. In 1923 it became a mutual association as Cosmopolitan Thrift Association. In 1926 a mutual legal reserve insurance company was organized under the same name and it was agreed that members of the old association might exchange their memberships for insurance contracts in the newly organized mutual legal reserve insurance company. These contracts were called "thrift certificates." In 1929 the name of the company was changed to the Cosmopolitan Old Line Life Insurance Company. The life insurance participation was comparatively small, the chief business being the selling of thrift contracts as before, but thrift contracts were issued by the new company and contained the added life insurance feature. From the first the contracts issued by the various companies were issued by a mutual organization owned exclusively by its members. Since the organization of the present life insurance company some straight life insurance not connected with the thrift certificates has been issued, but the funds in connection with such straight life insurance contracts have been separately held and are not involved in this action.

For each unit of a general thrift certificate the holder contracts to pay in one dollar each month for ten years. Thus, when matured, he has paid in $120. The certificate contains this provision: "The Company agrees that not more than $28.00 per unit shall be allotted during the life of this contract to the General Fund for payment of all expenses of supervision and management." The company, by the terms of the contract, agrees to act as trustee for all holders of this class of certificates, as a whole, for their payments, after deducting that proportion of the payment alotted for expense of supervision and management and the net premium on the amount of insurance in force the current year under each respective certificate, which resultant amount, together with the accumulated interest thereon, shall be the basis for the fund known as the "cumulative endowment fund," which shall constitute the surplus of the association belonging to the holders of this class of certificates.

The contract provides that the company will pay the holder at the terminal age of the certificate a sum of money computed as follows:

"1. The entire amount he has placed in the Cumulative Endowment Fund, plus,—

"2. His proportionate share of the net interest earnings on said fund compounded annually, plus,—

"3. His proportionate share of the money left in the fund by reason of lapse of other holders of such certificates, together with the interest accumulations thereon, compounded annually, plus,—

"4. His proportionate share of all surplus interest earned on the funds of such members who withdrew before arriving at their terminal age, plus,—

"5. His proportionate share of all withdrawal values forfeited by beneficiaries who upon death of such member surrender the certificates for insured settlements, plus,—

"6. His proportionate share of all interest earnings compounded annually on all such withdrawal values forfeited by beneficiaries.

"7. Also a participation in any saving in expense of supervision and management as determined by the Board of Directors."

Then there was also a form of "Educational Certificate," which had the same general provisions of the other certificate described, but with the accumulations arising upon the forfeiture of the certificates on any surrenders upon the death of dependents for whose benefit the certificates were taken out.

Each application for a thrift certificate was attached to and made a part of the thrift certificate and contained this provision:

"I hereby designate the Cosmopolitan Old Line Life Insurance Company as Trustee of my payments to the Company or its authorized agent, and agree that my share of the Cumulative Endowment Fund of the Company shall be distributed according to the computation of the Company under the terms of the certificate to be issued to me hereon."

In blackfaced type on the margin of the certificate opposite the paragraph stating how settlements will be computed appears "Guaranteed Prompt Settlement of Full Share of Funds," and in a later paragraph of the certificate is stated: "The distribution of surplus, as well as the loan, extended insurance, and surrender values provided in this certificate are based upon the premiums paid rather than upon the American Experience Table of Mortality."

Literature put out by the company, and in evidence, says that the association "offers a unique plan of cooperative saving to the public" and, under the heading "How It's Done," recites: "First: Expenses are limited; Second: No dividends to stockholders; Third: Members get full share of surplus."

It should be stated early that there is no evidence showing or tending to show that Matthews, who is held for the payment of this large sum, ever profited to any extent (unless he profited by overpayment of his own thrift certificate), or that any of the other seven directors, who

were Fred Eymer, an employee of the company, F. B. Fleming, Sterling F. Mutz, H. A. Taylor, R. W. Reynolds, C. H. Roper, and D. H. Campbell, and voted the disbursements of the company on thrift certificates maturing from time to time during the period (1928 to 1935), ever profited personally. Yet none of the other directors was made a defendant in this action.

Defendant Matthews was a director of the company continuously from 1922. He was vice-president from 1922 to 1927 and president from 1927 to 1930 and again in 1935. He was chairman of the investment committee from 1927 to the date of the trial, and was chairman of the board or executive committee from June, 1935.

The accounting firm of Martin & Cole made an investigation and report with particular reference to the amounts paid by the company on thrift certificates of the character owned by plaintiffs and others for whom they brought suit, to determine whether there had been overpayments on those certificates paid from 1929 to 1935, both years inclusive. They did not pretend to make a complete audit of the affairs of the company. The company furnished them such records as were needed for the purpose. Primarily the records used were the general ledger and certain books of original entry and the worksheets of the company actuary which had been used by him to provide the data for fixing payments each of the years named. These worksheets were made by D. H. Campbell, who was the actuary as well as vice-president of the company. They were in his handwriting and were made each year by him up to the time of his death (probably in July, 1934).

O. R. Martin and Edward E. Lamphere, of Martin & Cole, did most of the investigation for plaintiffs (though others of their organization worked on the investigation) and both of them testified and their written report is in evidence. Mr. Martin testified in support of the report. On cross-examination he admitted certain errors in his report, but we do not think the errors were sufficient to change the legal result that would follow even if correction were al-

lowed for the errors. It would take too much space and discussion to detail the results of the report, which can be readily noted in the following statement we have prepared, showing the year, the amounts deduced from the worksheets as actually payable on each unit, the correct amounts payable as deduced from all sources, the amounts actually paid and the total overpayment:

| Year | Amounts shown by Worksheets | Amounts Payable | Amounts paid | Overpayment |
|------|------|------|------|------|
| 1928 | $165.25 | $130.76 | $231.29 | $ 5,026.50 |
| 1929 | 140.33 | 135.70 | 210.88 | 11,502.54 |
| 1930 | 131.36 | 137.54 | 214.35 | 22,582.14 |
| 1931 | 124.72 | 132.57 | 214.60 | 13,699.01 |
| 1932 | 127.82 | 135.36 | 200.80 | 2,617.60 |
| 1933 | 129.90 | 136.37 | 175.55 | 29,132.38 |
| 1934 | 129.90 | 132.48 | 164.58 | 32,196.30 |
| 1935 | 128.48 | 126.16 | 150.86 | 38,803.70 |

$155,560.17

The report discloses that in the last three years about $65,000 came from the cumulative endowment fund and the additional excess payment of $90,000 came from the general fund. The great bulk of the company's business consists of these thrift units. As a result of the alleged unwarranted action of the company in taking money from these two funds to pay substantial bonuses to already matured thrift certificates, those funds have been depleted so that it is claimed to have jeopardized payments of certificates to mature later. And there is sufficient evidence to warrant the statement that the insurance department of the state stepped in and took over the company so as to make it more probable that the thrift certificate holders may stand a better chance to get at least their principal back than would be possible if the past management and practices had continued.

The minutes of the directors' meetings were in evidence for the years when these payments were made and they show that the payments were authorized by the directors

to be made on the maturing thrift certificates. We believe Matthews was present as a director at all of those meetings. The minutes show no dissenting vote on the subject of disbursements to pay maturing thrift certificates.

Defendant bases his denial of any overpayment, and if there were any overpayments to holders of thrift certificates, upon the advice and reports of D. H. Campbell, the skilled actuary of the company, and upon the advice of Sterling F. Mutz, the attorney, who were both directors of the company. As the minutes of the directors show, Mr. Campbell was a director of the company up to his death near the end of the period under examination, and Mr. Mutz was a director, too, during all the period. Usually the motion fixing the disbursement for the current year to maturing thrift certificate holders was made by the one and seconded by the other. They were considered to be supported by the worksheets of Mr. Campbell, the actuary, which must have been the result of complicated computations of the many intricate factors inhering in such matters. It is not claimed by any one familiar with such elements that it is a simple thing to determine results when so many factors have to be taken into consideration.

But, in each instance, there was added to the worksheet finding of Mr. Campbell, the actuary, a sum which appears to be arbitrarily added to secure the payments made to holders of thrift certificates. For example, the worksheet of the actuary Campbell, dated December 31, 1932, purporting to show the elements entering into the 1933 values to be distributed to thrift certificate holders, found the transfer value of these certificates as $129.90 each. When the directors met on January 30, 1933, the minutes show that the value of each thrift certificate was fixed at $175.55, and the evidence shows that the latter amount was paid. The amounts shown on the worksheet for each year and the amount paid to each thrift holder are shown on the schedule previously appearing in this opinion, based on the testimony of Mr. Martin.

Defendant procured and used in evidence a report of

Haight, Davis & Haight, consulting actuaries, who examined the company from October 15, 1925, to April 30, 1936. They also made use of an audit of October 15, 1925, made by Lester M. Buckley, a certified public accountant. Thomas M. Mott and Arthur Haight, on behalf of these consulting actuaries, testified for defendant. It might be said that their testimony sought to justify the attributing of general funds and of mortality funds to the payments of the amounts complained of by plaintiffs to thrift certificate holders, but that position was based upon the belief that the directors had a right, and the power, to determine how much of mortality savings can be distributed to certificate holders. That, of course, being a question of law, cannot bind the courts. So they were not permitted by the trial court to state the opinion. It might be well to remark here that mortality savings upon life insurance policies are in no way connected with this investigation. Whenever that term has been used by the parties it merely refers to any savings upon the thrift certificates.

To go into the many volumes of evidence would unduly extend this opinion. Suffice it to say that we think it fully sustains the findings of the trial court that the directors arbitrarily added each year to the funds payable to holders of thrift certificates sums not based upon actuarial findings and to which the thrift certificate holders whose thrift certificates were maturing during those years were not entitled. These overpayments jeopardized and depleted funds which should have been saved to apply to the certificates of holders maturing in later years, of which there were many. The probability, from the evidence, appears to be that, if the company had continued to make like payments to thrift certificate holders, these payments would soon have so depleted the funds of the company that they would early have reached the point that the thrift certificate holders could not be paid back the principal which they had paid in by persisting for the ten years of their contracts; and that, if and when the company was taken over by the state insurance department and in due time taken over

by another insurance company which would attempt to carry out the thrift contracts, a like result would follow.

Another phase of this case is involved in the purchase, as an investment for the company, of two certain mortgages made by Charles Neverve and wife. They were purchased from the Federal Trust Company (of Lincoln) in November, 1932. Mr. Matthews made the purchase and signed the company checks for them, totaling $9,300. He did not obtain an abstract showing that the mortgages were first liens on the real estate. It developed that Kansas City Life Insurance Company had a first mortgage of $10,800 and there were mechanics' liens on the property aggregating $4,000. Defendant argues that he was not negligent in taking these mortgage loans without having an abstract of title furnished showing clear title in the mortgagor because (as he says) the Federal Trust Company was solvent and he had further protected the Cosmopolitan by having a surety bond in a reputable company furnished by the Federal Trust Company guaranteeing the Cosmopolitan that no loss would accrue by reason of the purchase of such mortgages. The record does not bear out the statement that the Federal Trust Company was in good financial condition when the Neverve loans were taken, whatever Mr. Matthews may have supposed; it was made a bankrupt a few months later. The Neverve first mortgages were purchased by the Kansas City Life Insurance Company, they were foreclosed by it, and in the decree they were made a first lien on the real estate, the mechanics' liens were made second liens, and the claim of Cosmopolitan Life Insurance Company was disallowed and canceled.

We are of the opinion the district court was right in holding that, in the circumstances, defendant Matthews was liable for not securing mortgage investments that were first liens.

From the facts appearing in evidence, we apply the following principles of law:

"A director of a corporation bears to it and its stockholders a fiduciary relation and is treated by courts of

equity as a trustee." *Howell v. Poff*, 122 Neb. 793, 241 N. W. 548. See *Nebraska Power Co. v. Koenig*, 93 Neb. 68, 139 N. W. 839; *Bodie v. Robertson*, 113 Neb. 408, 203 N. W. 590.

"Every violation by a trustee of a duty required of it by law, whether wilful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust." *First Trust Co. v. Carlsen*, 129 Neb. 118, 261 N. W. 333. See *Masonic Bldg. Corporation v. Carlsen*, 128 Neb. 108, 258 N. W. 44.

A trustee is personally liable to beneficiaries of a fund for any misapplication of the fund to other beneficiaries not entitled thereto. *State v. Lincoln Hail Ins. Co.*, 133 Neb. 496, 276 N. W. 169.

Under the general principles of equity, aided by sections 44-1106, 44-1107, and 44-1108, Comp. St. 1929, a mutual life insurance company may not discriminate in its distribution to its members.

The surplus of a mutual life insurance company belongs to its members and a minority member may sue, on behalf of himself and all others similarly situated, for misapplication thereof. *Folts v. Globe Life Ins. Co.*, 117 Neb. 723, 223 N. W. 797.

A domestic insurance company is limited in its real estate mortgage investments to bonds or notes secured by first mortgages. Comp. St. 1929, sec. 44-310.

The judgment of the district court is

AFFIRMED.