742

STATE, EX REL. CHARLES SMRHA, APPELLEE, V. COSMOPOLITAN
OLD LINE LIFE INSURANCE COMPANY ET AL., APPELLEES:
HERMAN F. GARTNER, INTERVENER, APPELLANT.

291 N. W. 72

FILED MARCH 22, 1940. No. 30626.

*Frank A. Peterson*, for appellant.

*John S. Logan, Perry, Van Pelt & Marti, C. J. Campbell* and *Max Kier, contra.*

Heard before ROSE, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and ELLIS and WENKE, District Judges.

MESSMORE, J.

This case has been presented and argued to this court on three occasions. See *State v. Cosmopolitan Old Line Life Ins. Co.*, 136 Neb. 833, 287 N. W. 654.

The Lincoln Liberty Life Insurance Company, on April 19, 1938, filed application in the district court for Lancaster county, setting forth that the department of insurance of the state of Nebraska took possession of the property, records and effects of the Cosmopolitan Old Line Life Insurance Company (hereinafter referred to as the Cosmopolitan Company); that on December 12, 1936, the court directed the department to conduct the business of the company and

retain possession of its property, records and effects until the further order of the court; that on February 15, 1938, said court ordered the department of insurance and its director to liquidate the assets of the Cosmopolitan Company, and, pursuant to such order, the director of the department of insurance was authorized to enter into a reinsurance and servicing contract with the Lincoln Liberty Life Insurance Company, which contract was entered into on March 1, 1938, and became effective by order of the court on March 30, 1938; that on March 31, 1938, the insurance department was directed, as liquidator, to turn over to the Lincoln Liberty Life Insurance Company the property, records and effects of the Cosmopolitan Company, except the sum of $10,000, reserved for legal expenses; that, in compliance with said order, the transfer was made as directed by the court. The purpose of the application was to have the court consider the rights of certificate-holders, make specific findings and determine whether such certificate-holders should have the right and privilege to reinstate their certificates, and, if so, upon what terms and conditions.

A petition in intervention was filed on April 30, 1938, by Herman F. Gartner, for himself and all other certificate-holders similarly situated, setting forth the same historical subject-matter as appears in the application of the Lincoln Liberty Life Insurance Company, and, in addition thereto, the following pertinent facts: From 1926 to December 12, 1936, the Cosmopolitan Company issued to its members contracts, with combined savings and insurance features, described as thrift certificates, which provided for monthly payments of $1 per unit, a unit representing a payment of $120 over a 10-year period, or quarterly payments of $3 per unit, or semiannual payments of $6 per unit, or annual payments of $12 per unit, payable in advance. On December 12, 1932, intervener Gartner purchased 12 thrift units, providing for a payment of $120 on each unit by instalments over a period of ten years. He made payments to the Cosmopolitan Company for two years and eight months, totaling the sum of $384, and paying until August 12, 1935.

The increasing benefit thrift certificates contained the following language:

"In case the member fails to make his regular payments as prescribed on the face of this certificate, and in advance, he shall have thirty days grace from the date the payment became due, during which period this certificate shall remain in good standing. The unpaid amounts completing the current year's payments shall be deducted from any settlement under this contract.

"If the member fails to make the payments, prior to the expiration of the thirty-day grace period, this certificate shall automatically lapse; provided, that in case the lapsed member desires to reinstate this certificate he may do so within two years from the date the last payment became due by paying an amount equal to all overdue payments plus six per cent. compound annual interest thereon."

Intervener Gartner further alleged that, by reason of the department of insurance taking possession and control of the property, records and effects of the Cosmopolitan Company, he did not, and could not, pay his premiums and reinstate his certificate during said period from December 12, 1936, to August 12, 1937, and did not, and could not, procure the loan or cash surrender value of his certificate; that doubt, uncertainty and confusion existed as to the legal rights and status of the company; that intervener had no satisfactory assurance that the company or the insurance department could lawfully reinstate the certificate, and uncertainty existed as to the safety of his investment and the ability of the company to carry out the terms of the certificate contract; that on August 11, 1937, the date on which the two-year reinstatement period expired, intervener had a loan or cash value, under the terms of the certificate, of $103.58; that under the strict terms of the certificate this amount was lost to him. Intervener prayed that.the court determine that he and all other certificate-holders similarly situated have not forfeited their rights under their certificates, and that they shall have a reinstatement period equal to the time that was left to them for reinstatement

subsequent to the 12th day of December, 1936, and for such other relief as may be just and equitable.

George J. Wagner filed a petition in intervention and answer to the petition in intervention of Herman F. Gartner, denying the right of Gartner and certificate-holders similarly situated to reinstatement; alleged that in April, 1932, he purchased from the Cosmopolitan Company five units similar in all respects to the units purchased by Gartner. The crux of his contention follows: The certificate in question contains the following specific provisions under paragraph 5 thereof:

"The Company agrees to extend special services to all members as follows: * * *

" (b) To pay to the holder hereof at the terminal age of this certificate, or to any one designated by a court of competent jurisdiction to act for him, or to any person, firm or corporation designated by any one so authorized in his settlement application, the same day his application for settlement is received except not earlier than the terminal age date, a sum of money computed as follows: (as evidenced by the table appearing in the certificate which need not be here set out.) * * *

"3. His proportionate share of the money left in the fund by reason of lapse of other holders of such certificates, together with the interest accumulations thereon, compounded annually, plus," etc.

The answer further alleged that the intervener Wagner paid premiums as required by the certificate, has kept the same in full force and effect, and is entitled to its benefits, as disclosed by the preceding paragraph herein.

The department of insurance and director thereof, as liquidators of the Cosmopolitan Company, filed answer to the petition in intervention of Herman F. Gartner, admitting the material allegations of fact contained in such petition, and alleging that, after the department of insurance had taken over the property, records and effects of the Cosmopolitan Company, the department received an order from the district court for Lancaster county, then exercising

jurisdiction over the proceeding, directing and restricting the operation and management of the Cosmopolitan Company. This order was copied into the answer and authorized the insurance department to examine, adjust and pay all proper death claims and annuities under the contracts of said company due and owing it, and the remaining unpaid thrift contracts, which matured December 1, 1936, upon the same basis as established by the company; to receive all authorized payments tendered by contract holders or debtors, and to take the necessary steps to collect and receipt for all interest and principal payments on any investments, contracts or choses in action now held for the benefit of the company; in general, to do any and all things needful for the proper conduct of the company. This order was unappealed from and became and was the directing law of the case.

The decree of the district court of October 17, 1938, declared that by the terms of the certificate of intervener Herman F. Gartner the certificate lapsed and was without force and effect at the expiration of 30 days of grace, following the date of August 12, 1935. The court further found that the reinstatement period of the certificate expired August 12, 1937, and it became null and void, and the intervener was without right to reinstate the same; further, that during the reinstatement period from August 12, 1935, to August 12, 1937, intervener Gartner was possessed of the right and privilege of reinstating his certificate by making payment to the Cosmopolitan Company as provided by the terms of the certificate; that the department of insurance conducted the business of the Cosmopolitan Company from December 12, 1936, until the order of liquidation made on February 15, 1938. Intervener Gartner appealed.

The record discloses, in addition, the following: Intervener Gartner did not make application for a loan during the period the company was under the charge and direction of the insurance department. Death losses and annuities were paid, as well as premiums on contracts accepted. No loans were made to certificate-holders, but applications were

received and filed. Any loans made would have to be by authority of the court, as stated by the department of insurance. After the department had taken over the business of the company, intervener Gartner was permitted to pay in the amount of $72 in three instalments of $24 each, thereby, presumably, paying on his contract to August 12, 1935. The department refused to make loans to the owners of thrift certificates as provided by the terms thereof.

The question with which we are directly concerned is whether or not the contract in the instant case is an insurance contract, within the meaning of the law of this state governing such contracts.

A careful examination of the contract discloses the following insurance features incorporated therein: The first page of the certificate binds the company "for and in consideration of the warranties contained in the application herefor * * * and of the payment to the Company of the monthly premium specified in the margin hereof," to pay to his wife, the beneficiary. The application attached to the certificate executed by Gartner sets forth his place of birth, age, occupation, nationality, sex, marital status and beneficiary designation; containing the following provision: "I agree that the certificate issued hereon shall not take effect until the first payment has been received by the company during my good health." The amounts to be paid are designated as monthly, quarterly, semiannual or annual payments, thus making payment of premiums optional and not strictly monthly. The contract designates that the company "agrees to pay to Hulda Look Gartner, beneficiary, related to the member as wife, upon satisfactory proof of death of the member while this certificate is in full force and effect, twelve times the amount shown by column (4) of the Table of Values herein to be insured on the date of member's death, less any indebtedness hereon, in cash in one lump sum, or such optional settlement provided for herein as the member shall have last specified in written notice to the Company, * * * ." Section 11 of the contract provides for the filing of proofs of death and designates how the proofs shall be made,

and refers to column 4 of the table of values, determining the amount of insurance per unit for each year of the contract.

Section 6 contains language as follows: "The following table shows the cash value, loan value, and the amount of insurance protection under this certificate, each while this certificate is in good standing and before the expiration of the grace period. Amounts shown are per unit of this certificate as specified on the face hereof; hence multiplied by the number of units hereof." Column 1 contains the year, first, second, third, etc.; column 2 the annual premium; column 3 the amount paid per unit each year; column 4 amount insured; column 5 cash or loan value. Column 4 shows an increase in amount insured over amount paid each year. Under "General Provisions," after the word "Basis," appears this language: "1. This certificate is based upon renewable term insurance for a period of ten years." Under "Expense Limited:" "3. The Company agrees that not more than $28.00 per unit shall be allotted during the life of this contract to the General Fund for payment of all expenses of supervision and management." Under "Options: Terminal Age Settlement:" "Option One: Conditioned upon satisfaction of the Company of insurability of the applicant, a paid-up policy of insurance on the life of applicant, for an amount equal to One Thousand Dollars ($1,000.00) per unit of the certificate to be surrendered, for a period which the amount of the cash settlement would buy as a single premium under the American Experience Table of Mortality and three and one-half per cent. interest, without any charge for expense (loading) ; or,—

"Option Two: Conditioned upon satisfaction of the Company of insurability of the applicant, a paid-up policy of insurance on the life of applicant, for the period of his life and for an amount which the cash settlement would buy as a single premium under the American Experience Table of Mortality and three and one-half per cent. interest, without any charge for expense (loading)."

There is no denial that this contract carries insurance

features as hereinbefore set out. The contention is that the insurance features are incidental to the contract; that the true function of the contract is evidenced by section 5 thereof, in substance as follows:

"The Company agrees to extend special service to all members as follows:

"(a) To act as trustee for all holders of this class of certificates, as a whole, for their payments as specified on the face of their respective certificates, after deducting that proportion of the payments allotted for expense of supervision and management and the net premium on the amount of insurance in force the current year under each respective certificate, which resultant amount, together with interest accumulations thereon, shall be the basis for the fund known as the Cumulative Endowment Fund, which shall constitute the Surplus of the Association belonging to the holders of this class of certificates;

"(b) To pay to the holder hereof at the terminal age of this certificate," etc. (under endowment accumulations).

"1. The entire amount he has placed in the Cumulative Endowment Fund, plus,—

"2. His proportionate share of the net interest earnings on said fund compounded annually, plus,—

"3. His proportionate share of the money left in the fund by reason of lapse of other holders of such certificates, together with the interest accumulations thereon, compounded annually, plus,—

"4. His proportionate share of all surplus interest earned on the funds of such members who withdraw before arriving at their terminal age, plus,—

"5. His proportionate share of all withdrawal values forfeited by beneficiaries who upon death of such member surrender the certificates for insured settlements, plus,—

"6. His proportionate share of all interest earnings compounded annually on all such withdrawal values forfeited by beneficiaries.

"7. Also a participation in any saving in expense of supervision and management as determined by the Board of Directors.

"Payable in cash in one lump sum if no other option stated."

The foregoing provisions of the contract refer to the thrift or savings feature incorporated therein and the advantage of lapsations to those who complete the contractual obligation. The insurance benefits provided by the certificate are in the amount of $15 a year per unit and increase $15 yearly.

" 'Term insurance' * * * is insurance for the term or period for which a premium has been paid, with the right to continue it from term to term upon payment of the proper premium." 37 C. J. 362.

The contention of appellee is: There is no reserve created on term insurance; no medical examination is required of the certificate-holder; no evidence of insurability is requested; the price per unit of the certificate does not vary according to the age of the certificate-holder, and the customary requirements of an insurance policy in such respects are missing. It is contended that the real purpose of the contract is to provide an attractive and desirable means of investing money over a period of years.

The appellee relies upon the case of *Howie v. Cosmopolitan Old Line Life Ins. Co.,* 132 Neb. 367, 272 N. W. 207, quoting at length the language of this court in reference to the same kind of a contract. However, a careful reading of the *Howie* case is at once convincing that the cause was brought upon the theory that the plaintiff could recover at law the cash value of her policy. The plaintiff in that case purchased a certificate of membership for two units in the Cosmopolitan Old Line Life Insurance Company October 29, 1926, and paid monthly premiums thereon from that date to and including July 29, 1931. Nothing was claimed under the reinstatement provision in the policy. The table of values provided that at the fifth year, if the certificate was in good standing, and before the expiration of the grace period, the owner of the certificate might withdraw $39.70 for each unit. Plaintiff sued for $79.40 and made no demand upon the defendant for payment of the cash value,

as evidenced by the contract, until February 21, 1935.

The right to reinstate the policy within two years, as provided in the contract in the instant case, was not involved in the *Howie* case; nor the question, whether or not the contract was an insurance contract, within the meaning of the law of this state and subject to subdivision 11, sec. 44-602, Comp. St. 1929, which would give to the contract-holder the period of three years within which to reinstate an insurance contract. The plaintiff had been in default almost four years. It was unnecessary, in any event, for the court to determine the kind of contract involved. The question was not an issue in the case. The court in the *Howie* case affirmed an order of the district court entering judgment for the defendant company on the pleadings and dismissing the action.

Appellee refers to the case of *Whaley v. Matthews*, 134 Neb. 875, 280 N. W. 159. It is true the opinion in that case did discuss the provisions of the contract as they applied to a holder at terminal age of the certificate and how the money was to be computed. The report disclosed that in the last three years about $65,000 came from the cumulative endowment fund, and the additional excess payment of $90,000 came from the general fund. The bulk of the business of the company consisted of thrift units. It was said in the opinion: "As a result of the alleged unwarranted action of the company in taking money from these two funds to pay substantial bonuses to already matured thrift certificates, those funds have been depleted so that it is claimed to have jeopardized payments of certificates to mature later;" the opinion stating that it was proper, under the circumstances, for the insurance department to step in and take over the control of the company. The court determined the duty of trustees, misapplication of funds of mutual companies, the liability of a director of the corporation and the relation a director bears to the stockholders. The court, in no event, determined the question presented in the instant case, and the holding therein would not be disturbed by an interpretation of the contract here involved.

The appellee's contention, therefore, develops this proposition: From each year's certificate payment the company bought enough insurance on the life of the certificate-holder to provide the amount of insurance for the particular year, as stipulated in the table of values, paragraph 6 of the contract. Other than this net deduction, coupled with a proportionate share of management and supervision, the entire remainder went into the trust fund. To provide extended insurance and cash surrender values would have required that the company violate the express terms of its contract with reference to the cumulative endowment fund. The carrying out of the conditions of the thrift certificate to intervener, as well as to other certificate-holders, required that only the net cost of the insurance during the particular year be deducted from the contract payment; that is, the intervener Gartner must claim, in order to be entitled to reinstatement, that the amount which he contributed to the cumulative endowment fund should be applied to the purchase of extended insurance. Such purchase, if made by the company, could only have been at the expense of the intervener's contribution to the cumulative endowment fund.

Our attention is directed to paragraph 16 of the contract, on the theory that the distribution of surplus, as well as the loan and insurance values provided therein, is based upon premiums, rather than upon the American Experience Table of Mortality.

Analyzing the contention of the appellee, it follows that there can be no extended insurance, cash or loan value, where, upon date of default, the policy does not possess any reserve or net value. The insurance features are separate and distinct from the savings feature of the contract, and were added as a further inducement to facilitate the sale of such certificates. Therefore, the contract provided for term insurance only. No reserve was built up after default in payment of premiums. There was no value remaining in the contract to purchase extended insurance or maintain the contract. The period of reinstatement must be limited

to the privileges expressed in the contract. The cash values thereunder arise by virtue of payments made to secure investment advantages. Cash values, not being accretions under the insurance feature of the contract and not being a part of the insurance reserve, are subject only to the stipulations of the contract providing for lapsation and forfeiture. With the foregoing contention and general summary thereof we cannot agree.

It is clear that the Cosmopolitan Old Line Life Insurance Company is a mutual reserve company. Section 44-101, Comp. St. 1929, defines insurance as follows: " 'Insurance' is a contract whereby one party called the 'insurer,' for a consideration undertakes to pay money or its equivalent, or to do an act valuable to another party called the 'insured' or to his 'beneficiary' upon the happening of the hazard or peril insured against, whereby the party insured or his beneficiary suffers loss or injury,"—in the instant case in the event of death of the insured.

Section 44-306, Comp. St. 1929, reads: "All domestic insurance companies, and insurance agent, solicitor, broker, surveyor or adjuster doing business in this state, and all insurance business transacted in whole or in part within or outside of this state, the subject and matter of which is located wholly or in part in this state, shall be subject to and be governed by this article, and the records of such insurance company, agent, solicitor, broker, surveyor or adjuster doing business in this state shall be subject to inspection and examination of the department of trade and commerce." A reading of the contract involved herein indicates clearly the adaptability thereto of the section of the statute quoted.

Recognizing that the insurance feature designated by the contract is 10-year term insurance, we believe there is a reserve value, although not stated in the policy, but the cash and loan values are made up from the value of the policy, including any profits, savings in load expense, and mortality, and other items which are included in the premium of every policy, whether term or otherwise. Term

policies, such as the 10-year term policy here considered, do have a cash value, as evidenced by the table of values shown in the contract, and the reserves are, by necessity, kept in force by each policy, so that obligations under such policies can be met when due. In a mutual company, such as the Cosmopolitan Company, appellee herein, the profits of the contract containing an insurance feature, as herein discussed and considered, belong equitably to the policyholders, and no reason exists why cash, loan and surrender values cannot be maintained on such policies, depending on the loading in the premiums charged, on savings, on mortality, and other profits. Such a cash value has been placed on these policies.

We refer to section 44-401, Comp. St. 1929, as amended by chapter 96, Laws 1935, which defines life insurance as insurance "upon lives of persons, including endowments and annuities, and every insurance pertaining thereto and disability benefits." The contract in the instant case falls within this definition. We also refer to section 44-602, Comp. St. 1929, which requires that every policy of life insurance, "except policies of industrial insurance or where the premiums are payable monthly or oftener," shall contain, among other things, provisions for nonforfeitable loan and surrender values and for extended insurance. Subdivision 11 of such section requires a provision in the policy that "if, in event of default in premium payments, the value of the policy shall be applied to the purchase of other insurance, and if such insurance shall be in force and the original policy shall not have been surrendered to the company and canceled, the policy may be reinstated *within three years* from such default, upon evidence of insurability satisfactory to the company and payment of arrears of premiums with interest." (Italics ours.)

The insurance obligation in the contract, together with the thrift feature thereof, was paid for by the same premium. The fund credited by the premium payments would be liable for all of the company's obligations, such as death benefits, surrender value and thrift terminal settlements; in

other words, the premium covered both insurance and thrift features, and the company so recognized. When the company attempted to set up property rights and benefits out of the premium which it collected on its integrated obligation, the terms and conditions of such rights and benefits were required to be in accord with the provisions of section 44-602, Comp. St. 1929. Said section, with reference to term insurance, as disclosed by Gartner's contract, provides for the setting up of the benefits and conditions therein prescribed which are applicable to such contract. Loan and surrender values cannot be set up with a forfeiture provision, and any cash value which a policy may have may be permitted to be used for extended insurance, and if such insurance shall be in force, and the original policy shall not have been surrendered to the company and canceled, the policy may be reinstated within three years from such default, upon evidence of insurability satisfactory to the company and payment of arrears of premiums, with interest. These requirements govern the duty and obligation of the company, even though the provisions of the policy did not comply with them. See Comp. St. 1929, sec. 44-602.

Intervener Gartner was entitled to have any cash value which the company had credited as of August 12, 1935, out of the premiums of his contract, applied to the purchase of other insurance in the amount then in force under the policy; to have his original contract reinstated upon evidence of insurability satisfactory to the company and payment of arrears of premiums, with interest. If the surrender value would not have purchased extended insurance, required to reinstate the contract, as shown by the evidence in this case, or if Gartner was no longer a desirable risk, then the opportunity should be accorded the company to show such facts.

Our former opinion, reported in 136 Neb. 833, 287 N. W. 654, is vacated; the judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED.

ELLIS, District Judge, concurs in the result.

JOHNSEN, J., concurring separately.

To me, the controlling question in this case is one of public policy. Shall an insurance company be permitted to collect premiums on a life insurance obligation, create cash values out of the money collected, and then confiscate or forfeit such rights on a premium default? I think not. The law abhors forfeitures generally, and in the case of insurance contracts they are quite intolerable.

The fact that the contract in this case was labeled a "thrift certificate" and combined a savings and insurance feature should not enable the company to dodge the statutes regulating the conduct of life insurance business or escape the rules of construction applicable to such contracts. Whether the company subsequently chose to make separate allocations on its records for thrift benefits and insurance costs is of no importance here. No such apportionment was made in the contract itself. The certificate-holder had no insurance protection except upon payment of the premium as an entirety. Since the insurance obligation rested upon the consideration of payment of the whole premium, it remained an insurance premium throughout. Any cash or surrender values created out of it were cash or surrender values derived from insurance premiums and could not be confiscated or forfeited by any contractual provision in conflict with the insurance statutes or rules of law applicable to insurance contracts. Not being forfeitable, such values were available for the purchase of extended insurance, with the accompanying right to reinstatement of the contract recognized by the statute.

The contention is made—and is accepted in the dissenting opinion herein—that no reserve was set up in connection with the insurance feature of the contract and that there was nothing therefore that could be used for the purchase of extended insurance. As to the allocations made by the company on its records, I find no evidence in the record. It is quite inconceivable to me, however, that a company would assume a ten-year insurance risk without creating a reserve against the hazard. The point, however, is quite immaterial

here, because, as I have already stated, the question is not what the company did on its records, but what it did in its contract. The contract sets up specific cash or surrender ·values out of premiums collected. These values were rights which could not be forfeited by any attempted apportionment or private bookkeeping on the part of the company.

I have previously expressed my views more fully in the ·dissenting opinion in *State v. Cosmopolitan Old Line Life Ins. Co.*, 136 Neb. 833, 839, 287 N. W. 654, 657, and I shall ·not repeat them here. The general public policy involved is to me more vital than the number of certificate-holders ·who may be affected by the present litigation.

PAINE, J., dissenting.

I respectfully dissent from the last opinion adopted by a ·majority of the court. This is a most difficult case. It was ·first argued to this court on April 4, 1939, with five judges sitting, two of our number being disqualified.

The court failing to adopt an opinion by the vote of four of the five judges sitting, it was reargued on June 8, 1939, with District Judges Lightner and Landis sitting as members of the court, and an opinion was adopted, and released September 29, 1939, which is found in 136 Neb. 833, 287 N. W. 654, in which two members dissented, and in which ·opinion a full discussion of the case will be found.

This opinion held: "A court of equity cannot grant relief against the clearly expressed condition contained in a valid 'benefit thrift certificate' issued by an insurance company, which provides that reinstatement of a lapsed certificate can only be had by the payment of past-due monthly instalments, with interest, within two years from the date the last payment became due."

Later a rehearing was granted, and the third argument occurred December 4, 1939, and the decision of the case hinges on whether the contract is to be considered as a thrift certificate or a life insurance policy, or contract. Let us examine the exhibits. On December 12, 1932, Dr. Gartner signed an instrument, at the top of which, printed in large ·capital letters, were the words, "Application for Thrift

Certificate." On examination of the instrument he purchased, we find on the outside it is "No. 67136," "Units Twelve," *"Increasing Benefit Thrift Certificate,"* issued to Herman F. Gartner, and on the inside the largest letters at the top of this contract, except for the name of the company, are the words, "Thrift Certificate." It seems rather surprising that, when intervener Gartner signed a written application for a "thrift certificate," and received a "thrift certificate," and is now bringing action on the "thrift certificate," this court should find that he applied for, and received, and now holds, an *insurance* contract.

This thrift certificate did not agree to pay a certain specified sum of money at the termination of the ten-year period, but undertook to pay him the $120 he would have paid in on each unit, with interest on the sums paid in, and, as in all "thrift" certificates, agreed to pay him the distributive share of the money forfeited by unfortunate certificate-holders who had lapsed in making their payments, together with the interest accumulations thereon, being those who had allowed the two-year period of reinstatement provided in the certificate to go by without reinstating their contracts, and also to pay him "his proportionate share of all withdrawal values *forfeited by beneficiaries* who upon death of such member surrender the certificates for insured settlements," together with "his proportionate share of all interest earnings compounded annually on all such withdrawal values *forfeited by beneficiaries."*

Can it be argued that the owners of these lapsed thrift certificates, written on a plan which has been forbidden in many jurisdictions, and which are no longer written in Nebraska, are entitled to all the protection given, under our law, to the holders of *bona fide* life insurance policies?

It should be clear that, if the holder of a certificate calling for certain thrift certificate units died, his beneficiary could continue to make payments on the thrift certificate, but if the beneficiary needed funds and selected to accept the so-called "life insurance" settlement, the beneficiary would thereby forfeit comparatively large sums of money,

as hereinabove set out. It would be abhorrent in a life insurance policy to read that a beneficiary who wanted payment in cash would be compelled to forfeit a portion of the principal and also interest accumulations. There is no question that the insurance department would forbid the writing of such an insurance policy.

The basic idea from its very inception had been to sell thrift contracts in which the benefits from lapsed certificates profited those who continued to pay. Of this there should be no doubt. The fact that the plan was amended, and an attempt made to promote sales of these thrift certificates by adding a very slight, yearly renewable, term insurance feature, without planning for any reserve to protect it, and in which the beneficiary could in no event draw more than $150 on a unit in which the owner of such unit had paid in the full sum of $120 over a period of ten years, does not, in my opinion, exempt a certificate-holder from being bound by the two-year provision of the contract which he applied for and received. To permit him, after he has failed to reinstate within the two years provided in his contract, to now avail himself of the provision of law which governs and protects *bona fide* life insurance policyholders, and to reinstate under certain conditions within three years, as set out in section 44-602, Comp. St. 1929, is in my opinion unjust and inequitable.

This litigation is carried on between two interveners. Dr. Gartner represents that small group which owns 1,876 certificates, representing 6,709 units, who have discontinued their payments, and have permitted their certificates to lapse under the terms of their contracts, and have not reinstated the same within the two years provided by their contracts. On the other hand, Dr. George J. Wagner, the appellee-intervener, represents in a way a large body of 7,824 certificate-holders, who have met every required payment according to the terms of their contracts, and now hold 40,708 units. It has always been my understanding of the law that, where there is no uncertainty as to the meaning of a contract, it will be enforced as made by the parties.

I believe that the decision of the trial court was right. The case was tried in the district court before J. H. Broady and E. B. Chappell, district judges, who rendered their decree, holding:

"(7) That intervener, Herman F. Gartner, failed to reinstate his said certificates within the time and in the manner provided by their express terms and that he lost all his rights thereunder and that his petition is without equity and should be dismissed.

"It is, therefore, by the court ordered, adjudged and decreed that intervener, Herman F. Gartner, and all other holders of certificates in Cosmopolitan Old Line Life Insurance Company similarly situated, who have permitted the reinstatement period of their said lapsed certificates to expire by failure to make payments as required by the terms of their said certificates, have lost all rights under their said certificates and that their said certificates are null and void and that said petition of said intervener, Herman F. Gartner, on behalf of himself and all other certificate-holders similarly situated, is without equity and should be and the same hereby is dismissed. Objections of George J. Wagner sustained."

Now, to the contrary of this holding, the effect of the majority opinion now adopted, as I view it, is to permit the few holders of lapsed thrift contracts to escape the two-year limit to reinstate, as provided by the contracts they purchased, and to allow them an extra year to reinstate, to the end that they can take from the faithful and diligent contract-holders who kept up every payment comparatively large sums of money specifically due the latter under the exact terms of their thrift contracts.